## REID v. SHAFFER.

(Circuit Court of Appeals, Sixth Circuit. March 6, 1918.)

No. 2872.

1. CANCELLATION OF INSTRUMENTS ☞58—INCIDENTAL RELIEF.
   Equity having jurisdiction of a suit to cancel a contract between complainant and defendant, giving defendant a percentage of the profits which were expected to result from complainant's acquisition of a leasehold, in which transaction defendant was interested, on the ground that defendant concealed a profit received from the owner, may, for the purpose of doing complete justice between the parties, decree a recovery of the sum concealed by defendant.

2. PRINCIPAL AND AGENT ☞48—DUTY OF AGENT.
   Absolute faithfulness and loyalty are required of an agent in whom confidence is placed, and personal benefit to him secretly obtained is incompatible with relation to agency.

3. FRAUD ☞11(2)—MISREPRESENTATIONS—OPINION.
   Where defendant, when he interested complainant in the acquisition of a leasehold, stated that it could be obtained for $60,000, but when the negotiations were actually entered into the owner demanded $65,000, defendant's statements concerning the $60,000 were a mere expression of opinion only.

4. PARTNERSHIP ☞5—RELATION—INTENTION.
   The relation of the parties is determined by their intention, and mere participation in profits will not alone establish a partnership.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes.

5. CONTRACTS ⬦147(3)—CONSTRUCTION.
In construing a contract, the intent of the parties is to be gathered from the entire contract and all the circumstances of the case.

6. JOINT ADVENTURES ⬦4(1)—GOOD FAITH—DUTY OF ASSOCIATES.
Where parties engage in a common enterprise by way of joint adventure, each has the right to demand and expect from his associates good faith in all that relates to their common interests.

7. JOINT ADVENTURES ⬦1, 4(1)—WHAT ARE—CONCEALMENT OF PROFITS.
Defendant interested complainant in the acquisition of a leasehold, stating that it could be bought for $60,000. The owner, who was selling the lease, to buy out his partners in the dry goods business, demanded $65,000. Complainant, after an independent investigation, agreed to pay the amount demanded, and he and defendant entered into a contract providing that for compensation for his services defendant should receive a certain percentage of the expected profits of the transaction. When the transaction was closed the owner was able to buy out his associates for $60,000, instead of $65,000, as he expected, and on defendant's demand the owner paid him the extra $5,000, which profit defendant concealed. Held, that the parties, regardless of the form of the contract, were joint adventurers, there being no sharing in the losses, so as to make them partners, and, while defendant was bound to exercise good faith towards complainant and to account for the profits, his concealment of the profit under the circumstances, as it was unexpected, should not work a forfeiture of his rights in the whole enterprise.

8. JOINT ADVENTURES ⬦5(1)—ACTIONS BETWEEN ASSOCIATES—REMEDY.
While assumpsit is the proper remedy for the recovery of a liquidated sum withheld by one joint adventurer from his associates in the transaction, recourse may be had to equity, where the amount is unliquidated and there is also a prayer for cancellation of the written contract between the parties relating to the transaction.

Appeal from the District Court of the United States for the Eastern District of Michigan; Arthur J. Tuttle, Judge.

Suit by Charles B. Shaffer against George F. W. Reid. From a decree for complainant, defendant appeals. Reversed, with directions.

R. M. Brownson, of Detroit, Mich. (Alex. J. G. Groesbeck, of Detroit, Mich., of counsel), for appellant.

Hal. H. Smith and Leo M. Butzel, both of Detroit, Mich., and Henry A. Gardner, of Chicago, Ill., for appellee.

Before WARRINGTON and DENISON, Circuit Judges, and HOLLISTER, District Judge.

HOLLISTER, District Judge. Burns-Hickey Company, a corporation engaged at Detroit in the dry goods business, Burns and Hickey each owning half of the common stock, and Navin and Mullin owning the preferred stock, had a lease from the Ferguson estate on the premises in Detroit in which it carried on its business, running for 25 years from August 17, 1912, at $25,000 a year. Burns, the president, and Hickey disagreed and the stockholders authorized, and caused to be advertised, a sale of the assets, including the lease.

Reid, the appellant, for many years connected with Bradstreet's Mercantile Agency and at the time and for a number of years their representative at Detroit, knew Burns and of his business troubles and

⬦For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

of the intended sale. Burns had several offers for the lease, one at $75,000, one at $80,000, and one at $100,000, which apparently failed only because of technical objections raised by the prospective purchaser's lawyer. The lease was of great value, the property being situated in that part of Detroit which at that time commanded large rentals constantly and rapidly increasing in amount.

Shaffer, the appellee, was a capitalist of Chicago, having apparently much ready money, with whom Reid had become acquainted through an investment of Shaffer's in Detroit. Burns wished to get rid of the other stockholders and to continue the business himself. He had practically no money, but he devised a plan for the sale of the lease, which contemplated a payment of sufficient cash by the purchaser to buy out the other stockholders, and, after the assignment of the lease to the purchaser, a re-lease from him for the balance of its term. Hickey offered to sell for $20,000. The sale of the assets was proceeding at a loss, and it is probable Burns at first thought that each of the interests of Navin and Mullin could be had at the same figure, for Navin told Burns he would take what the others did. Burns did not then know what Mullin would take.

Reid at first determined to buy the lease himself. Not having the ready money, he tried to borrow it and tried to interest others. Failing, he thought of Shaffer, and got in touch with him through Shaffer's brother, Harry, who was connected with Shaffer's Detroit business. Shaffer and his attorney, Gardner, came from Chicago to Detroit, and on March 12, 1913, paid $65,000 to Burns. Shaffer took an assignment of the Burns-Hickey lease and executed on that day a new lease to Burns-Hickey Company and Burns of the same premises at a rental of $35,000 a year for the first 12 years and for the remaining 12 years, 5 months and 16 days of the lease $40,000 a year. On the same day, Shaffer and Reid entered into a contract wherein it was recited:

"Whereas, George F. W. Reid, acting for the said Charles B. Shaffer, has carried on all the negotiations looking to the purchase of the lease of said property, and the re-leasing of the same; and whereas, the parties hereto are desirous of settling the compensation to be paid by the said Charles B. Shaffer to the said George F. W. Reid for his services and arranging for the payment of the same"

—and in consideration of these witnessed, among other things, that Reid was to have $2,000 per year net after Shaffer had received from rentals $65,000, with 6 per cent. interest, and agreed "to accept said payment as hereinbefore stipulated in full payment for his commissions and services rendered to" Shaffer. It was provided further that, in case the premises should be vacated, Reid should be given "the first opportunity of negotiating a lease of said premises for thirty-five thousand ($35,000) dollars or better"; that in case the premises should be leased for less than $35,000 then his payment under the contract should be prorated, and in default by Burns-Hickey Company in payment of rent the $2,000 would be suspended until the premises were leased to other parties.

On the same day Burns paid his associates $20,000 each, totaling

$60,000, and on the next day, March 13, he gave two checks to Reid, each for $2,500, one dated March 13 and the other March 17. The payee was not named. Reid put in his own name, indorsed the checks, and drew the money in cash from the bank on which they were drawn. He had an account at that bank. In a later transaction, Shaffer found out that Reid had received these checks. Thereupon he brought this suit against Reid to recover $5,000 and for a cancellation of his contract with Reid, on the alleged ground that Reid was his confidential agent in the transaction, upon whom, and upon whose representation that the cash required was no less than $65,000, he relied—praying that Reid account to him for the $5,000, that the contract be canceled, and Reid enjoined from prosecuting any suit on it.

The trial court found the action to have been properly brought in equity, that Reid deceived Shaffer as to the amount of cash necessary for the deal, had acted in the dual capacity of confidential agent for both Shaffer and Burns in the same transaction, and, while so acting, improperly received compensation from each for his services. The prayer was granted. All of the errors assigned either cover these two findings, or attack the findings and final decree on the ground that they are contrary to the evidence and without sufficient evidence to support them.

[1] We think the equity jurisdiction of the court was properly invoked. The action was to cancel a written contract continuing in nature, which, by its terms, gave Reid certain control in obtaining new tenants in the event the property became vacant. Shaffer was not required to await Reid's pleasure in bringing a suit, and his remedy was fuller, more complete, and more adequate by an action in equity to cancel the contract, and, thus obtaining jurisdiction, to obtain, if justly he should have it, a decree in one suit canceling the contract, and incidentally, in doing complete justice between the parties, to obtain a recovery of the money. Simpkins' Federal Equity Suit (2d Ed.) pp. 22, 23, 24; Bank of Kentucky v. Stone (C. C.) 88 Fed. 383, 391; Schmidt v. West (C. C.) 104 Fed. 272, 274; Mutual Life Ins. Co. v. Pearson (C. C.) 114 Fed. 395, 397; 2 Story's Eq. Jur. (13th Ed.) art. 700; Boyce v. Grundy, 3 Pet. *210, *215, 7 L. Ed. 655; Sullivan v. Railroad Co., 94 U. S. 806, 811, 24 L. Ed. 324.

[2] On the facts so stated, and in view of the rule of agency that when one authorizes another to act for him and in his stead, relying upon him and on his judgment and discretion, absolute faithfulness and loyalty are required of him in whom the confidence is placed, and personal benefit to him secretly obtained is incompatible with the relation between the parties (Mechem on Agency [5th Ed.] §§ 178, 1588, 1589, 1590), no attack on the decree could successfully be made. But the facts stated are but the skeleton of the case, the complete structure of which only appears when all the facts, circumstances, and necessary inferences are disclosed.

[3-7] On Reid's initiative, through Harry Shaffer, he and Shaffer met and discussed the purchase of the lease. In that conversation there is no doubt that Reid, in speaking of the amount of cash involved, said something about $60,000, and indicated his plan that he and

Shaffer should share the profits equally. Shortly thereafter Reid, on March 4, 1913, wrote a letter to Shaffer at Chicago, in which he set forth the advantages of Burns' lease, and Burns' intention to buy out the interests of the other stockholders from the money received for the lease. The letter proceeds:

"The net cost of the lease to you is $65,000, and he will in turn pay you $32,500 per annum for the first ten years, plus 5 per cent., and for the next fifteen years he will pay you an annual rental of $35,000, and will in turn assign to you the subleases as they are made and this will be net to you. The way I figure is this: That it will take between eight and nine years to pay you back the entire $65,000, together with interest at 5 per cent; after that time the excess over the $25,000 will be divided equally."

He said men of ability who knew the conditions in Detroit were all of opinion—

"that this is a very excellent proposition so far as we are concerned and cannot see any chance whatever for any loss. * * * I am convinced that this is a good proposition, and I only wish I, personally, were in possession of this amount of money, as I would be very glad to invest my own funds in same if I had it. * * * You can depend upon me to protect your interests at all times, and will say that this is right in my line, for the reason that I own a number of pieces of real estate in Detroit and have made a very close study of the conditions here, and in this proposition I know that I am right, and that there is no chance whatever for you to lose, but, on the contrary, will make a large sum of money."

Shaffer's Chicago lawyer, Gardner, after reading the letter, was requested by Shaffer to go to Detroit and determine whether the proposition was a good one in his opinion. Gardner came to Detroit and met a number of important persons acquainted with real estate values. He talked with Reid, who took him to see Burns. Gardner testified:

"Burns said it was a very good deal; that he had an offer at that time of $75,000 cash for his leasehold, but that he was anxious to go on with the business, and he would rather sell his leasehold for $65,000 and get a lease back than sell it for $75,000."

Gardner reported to Shaffer favorably. After hearing Gardner's report, Shaffer, seeing the opportunity for greater profit, wrote Reid (March 7) that his attorney had submitted his report and that after thinking the matter over he determined to make the following offer—

"which you may submit to Burns: I will pay $65,000 cash for an assignment by the present lessees of the lease from the Ferguson estate. I will then execute a sublease to Burns on the following terms: $35,000 per year for 12½ years, and $40,000 per year for the balance of the term. * * * If this proposition is satisfactory, send me a copy of the original lease at once. My attorney will prepare a lease from me to Burns and will submit it to him for approval. * * * Of course, there may be certain minor details to consider; but we can settle them when the papers are prepared."

It thus appears that Reid's proposition to Shaffer was not accepted, and Shaffer's counter proposition not only contained a material increase in the rental ($50,000) but left the way open for him to obtain, as he did obtain when the transaction was carried through, 6 per cent. on his $65,000 before anything was paid to Reid, instead of 5 per cent.

Burns objected to the increased rental. Reid wrote to Shaffer March 10, 1913:

"When I proposed the increase in rental to Mr. Burns, he at first felt that we were pressing him pretty hard, but after explaining it to him, and talking the matter over with him, I proved to him that the proposition was a fair one, inasmuch as, at the end of 12 years, he would share in the benefits of the increased value of the property and could well afford to pay that rental. He finally consented. It is my judgment, however, that after a conference between all of us on Wednesday that every detail can be arranged satisfactorily to all concerned."

Burns accepted, but not until after his friend Clark of the First National Bank advised him to do so. Shaffer's proposition of $65,000 in cash and larger rentals was made with absolutely no reliance upon Reid, or anything he had said. Even if it were true that Reid had at first said positively that the cash involved was $60,000, that representation was not the inducing cause of Shaffer's entering into the transaction. However, after full independent investigation, Shaffer fixed the figure at $65,000 himself, as the cash he was willing to pay. In fact, Reid did not know, and could not have known, that Mullin would take $20,000 for his stock. Burns did not know, nor could he have known, that fact, for Mullin was demanding $25,000, and was not willing to take less until the very day the transaction was closed. Burns then brought him to terms by telling him that, unless he took $20,000, the whole deal would fall through.

The record does not disclose when, if at all, Reid learned of Mullin's demand. Notwithstanding Shaffer's testimony as to the positive quality of Reid's statement (denied by Reid), Harry Shaffer's testimony, on cross-examination, that Reid said he "thought" the stockholders would sell for $60,000, must be taken as true, because, if for no other reason, it alone comports with reason and probability. That Shaffer honestly thought the original figure was $60,000 is shown by his letter of March 5 to his brother, Harry, the day after receiving Reid's letter. He says, among other things:

"It shows that I am obligating myself, not only to pay the $65,000, but, in addition, $25,000 a year for 25 years, which changes this thing very materially. As I understood it from the conversation in Mr. Reid's office, when I put up this $60,000 then, but $65,000 now, that was the extent of my liabilities. * * * However, rather than to disappoint you and Mr. Reid, if, on examination by my lawyer, he finds it a fairly safe investment, I will put up the money on this condition: After I get my money back, which will take about 8½ years, there will be an income of $10,000 a year. I will take $6,000 of this, and you and Mr. Reid split the other $4,000. You dug up the dough; consequently you are entitled to half of the commission with Mr. Reid. That would be my way of looking at it, and I think Mr. Reid will be perfectly agreeable that you should have it."

Whatever was said about the $60,000 was nothing more, and could have been nothing more, than a tentative suggestion of the probable amount of cash the transaction would require. It was the expression of an opinion only. Southern Development Co. v. Silva, 125 U. S. 247, 256, 8 Sup. Ct. 881, 31 L. Ed. 678. Reid took Burns' proposition of $65,000 and certain rentals to Shaffer. Burns made the price, not Reid. Shaffer was in Chicago; Burns in Detroit. Shaffer sent back

a counter proposition for submission to Burns. The terms were made by Shaffer, not Reid. Reid gave his opinion to Shaffer on the value of Burns' offer; but it was not that which influenced Shaffer. He relied on Gardner. Reid tried to bring Burns up to Shaffer's offer, but Burns did not rely on him in accepting it. He relied on Clark. We are unable to see how, under these circumstances, he was the confidential agent of either Shaffer or Burns, on whose judgment and discretion they or either of them relied.

But it is said by Shaffer that Reid told him $65,000 was the least Burns "could buy his partners out for." Just when and where that was said, if it was said, does not clearly appear. But, assuming that Reid said so and that it is material, the facts show the statement to be substantially true. Burns testified positively and repeatedly that he never offered the lease to Reid, or anybody else, at less than $65,-000. Why Burns put this figure at $65,000 is easy to understand. Hickey would sell for $20,000; Navin had said he would take what the others took; but Mullin was insisting on $25,000. This makes $65,000. In one aspect, if Navin would require what Mullin was willing to take, $70,000 would be needed. It may be that Burns' necessities were such, including his desire to get rid of the other stockholders and run the business himself, that, as he says, he might have taken less than $65,000. He could not say. That he might have done so is mere speculation. This we regard as unimportant, for the price he fixed was his own, never deviated from, and was a figure prudence and apparent necessity required. Shaffer knew what the money was needed for, and neither Burns nor Reid knew, nor could have known, but that the amount necessary was at least $65,000.

We are unable to see anything in the relation between Reid and Shaffer, under the circumstances disclosed, which imposed a duty on Reid to Shaffer to try to get Burns to throw off a part of the cash the stockholders were demanding. If it is suggested that Reid is estopped to deny an agency by the offer in his letter to look after Shaffer's interest and by the language of the contract, it may be said that the offer was declined by Shaffer, and in any event was made after the cash price was fixed, and really had to do with matters subsequent to the purchase. What relation, in legal contemplation, is established in the infinite variety of men's dealings with each other, is sometimes a matter of exceedingly careful discrimination. Reid's lawyer, McKay, with whom Reid and Gardner consulted briefly, dictated the contract in their presence; but it is not probable that the use of the words "negotiations" and "commission" and "compensation" were intended, through any technical meaning they bear, to give a character to the contract different from the relation the testimony and the contract show the parties bore to each other.

The relation Reid sustained to Shaffer was quite different from agency within the meaning of the rule. From the beginning Reid insistently and repeatedly demanded of Shaffer one-half of the profits after Shaffer got his money back and interest. The profits were all rentals over the $25,000 a year Shaffer must pay as assignee of the original lease. Shaffer and Harry understood Reid's claim perfectly.

Harry, who had introduced Reid to his brother, and who was accustomed to receive 25 per cent. of the profits of deals in which he introduced his brother as the financial man, was demanding one-half of Reid's share of the profits. The matter was never settled until the day the transaction was closed, and afterwards, as nearly as may be gathered from the record, Shaffer held the whip hand and required Reid to agree to Harry's participation with Reid in equal shares. Reid was compelled to come to Shaffer's terms. These were based on rentals fixed by Burns in the original proposition brought to Shaffer. Those terms showed a profit, figuring not too exactly, of about $10,000 a year. Even this Shaffer was not willing, as the contract shows, to divide on the percentage of 50 per cent. to himself and 25 per cent. each to Reid and Harry. But the division he was willing to make, and did make, was 20 per cent. for each of the others. The $2,000 to Reid in the contract is that 20 per cent.

It will be noticed, however, that at the increased rentals required by Shaffer, and obtained by him, the annual profit would be something between $12,000 and $13,000, resulting in Shaffer's obtaining considerably over 60 per cent. and Reid and Harry considerably less than 20 per cent. But the circumstances and the contract itself show that the basis on which Shaffer and Reid were dealing was a division of the profits. It is true Reid's share was a fixed sum, but it was nevertheless a share in the profits, because he had not dealt with Shaffer on any other basis during the whole transaction, and the contract itself shows that if the rate of rental were reduced to less than $35,000 Reid must suffer proportional abatement, and if Shaffer's lessee defaulted in the rent Reid would get nothing.

Reid was not Shaffer's agent, nor was he his partner. The relation of the parties to each other is determined by their intention. Berthold v. Goldsmith, 24 How. 536, 542, 16 L. Ed. 762; Beecher v. Bush, 45 Mich. 188, 204, 7 N. W. 785, 40 Am. Rep. 465. It was said by Mr. Justice Harlan in London Assurance Co. v. Drennen, 116 U. S. 461, 472, 6 Sup. Ct. 442, 444 (29 L. Ed. 688):

"Mere participation in profits would give no such interest contrary to the real intention of the parties. Persons cannot be made to assume the relation of partners, as between themselves, when their purpose is that no [such] partnership shall exist. There is no reason why they may not enter into an agreement whereby one of them shall participate in the profits arising from the management of particular property without his becoming a partner with the others, or without his acquiring an interest in the property itself, so as to effect a change of title."

"The real test of partnership," says Judge Ward, "is whether the parties are jointly interested as principals and may bind each other by their acts or engagements within the scope of the enterprise." Keith v. Kellermann (C. C.) 169 Fed. 196, 199.

It is immaterial that the words "commission," "compensation," "negotiations," etc., are used, for the intention of the parties is to be gathered from the entire contract and all the circumstances of the case. It was said by Judge Cooley in Beecher v. Bush, 45 Mich. 188, 194, 7 N. W. 785, 40 Am. Rep. 465, citing Chancellor Kent in Post v. Kimberly, 9 Johns. (N. Y.) 470, 504:

"The law must declare what is the legal import of their agreements, and names go for nothing when the substance of the arrangement shows them to be inapplicable."

The circumstances will not stand the tests which determine agency or the partnership relation, and yet Reid's relation to Shaffer required good faith. Reid may be described as a "quasi partner," responsible to Shaffer for losses sustained by misconduct or misapplication of the funds, who owes with respect thereto the same duties and obligations as would exist if the parties had been partners in fact and law. Marston v. Gould, 69 N. Y. 220, 225. The enterprise was a joint adventure. The subject is dealt with at some length in Jackson v. Hooper, 76 N. J. Eq. 185, 197, 74 Atl. 130 (27 L. R. A. [N. S.] 658), wherein the headnote aptly states the opinion of the court:

"A 'joint adventure' may exist where persons embark in an undertaking without entering on the prosecution of the business as partners strictly, but engage in a common enterprise for their mutual benefit; they each have the right to demand and expect from their associates good faith in all that relates to their common interests."

Shaffer claims the $5,000 as his own, since it was a part of his $65,000; but it was not his. The money belonged to Burns, who made it when he forced Navin to abate his price in that amount, and we see no reason, as between them, why Burns should not have given it to Reid if he wished to do so. But, as between Reid and Shaffer, good faith required that Reid should inform Shaffer of the receipt of the money. The understanding for a division of profits necessarily meant all profits. The division on the basis of profits required that both parties should know what all the profits were.

It would not be useful to discuss at length the respective theories of Burns and Reid upon which the payment was made. Some of their explanations have elements of plausibility, and some are altogether futile; but it is quite clear that, for some reason, Reid did not wish it known he had received the money. On our theory of the case the reason was that Reid appreciated his relation to Shaffer, and was willing to, and did, secretly appropriate an unexpected profit which belonged to both parties. Equity requires that Reid account to Shaffer for that money. On such accounting, a part of it would belong to Reid; but just what part, under the terms of the contract, it would be impossible now to determine. The money should be paid to Shaffer. Such payment will accelerate the time when Reid's receipts are to begin, and thereby lengthen the time during which he will participate; but that participation will include the $5,000 in the ratio that $2,000 a year bears to the total profit of that year.

Since what Reid was to get was not "commissions," as upon an agency, or "compensation" for services rendered, whatever the contract says, and the transaction was a joint adventure on the basis of profits, we know no rule which would require a forfeiture by Reid of all the fruits of the joint enterprise. As it was not contemplated that any part of the profits should be paid to Reid until a time still far in the future, we think the just disposition of the case requires the present payment to Shaffer of the $5,000 and interest, but that the

contract should remain in full force. Under all the circumstances, neither party can justly complain of this conclusion.

[8] We are aware that in some cases of joint adventure assumpsit has been regarded as the proper remedy for the recovery of a liquidated sum withheld from the other by a joint adventurer. Galbreath v. Moore, 2 Watts (Pa.) 86; Hurley v. Walton, 63 Ill. 260. Yet the impossibility of fixing an exact sum which could be recovered at law, together with the prayer for a cancellation of the contract, and the other circumstances hereinbefore stated, leave no doubt of the jurisdiction of the court in equity, notwithstanding the misconception of the parties of their relative rights, as shown in the bill and answer. The bill specifically prays "for such other and further relief as the equities of the case may require." A just balancing of the equities requires the present payment of the $5,000 and interest to Shaffer, and the retention by Reid of his share of all the profits, as hereinbefore set forth.

It follows, from what has been said, that the decree below should be reversed, in so far as it directs a cancellation of the contract and adjudges Shaffer to be entitled to the $5,000 and interest from Reid as his agent, or is otherwise inconsistent with this opinion. The District Court is directed to enter a decree in accordance with the views herein expressed. The costs of the appeal will be divided equally between the parties.