## E. D. BEDWELL COAL CO. v. STATE IN-DUSTRIAL COM. et al.

No. 22216. Opinion Filed March 8, 1932.

Rehearing Denied May 24, 1932.

Varner & Varner, for petitioner.

Hayes, Richardson, Shartel, Gilliland & Jordan, for respondents.

RILEY, J. Presented herein is a petition to review an award made by the State Industrial Commission in favor of respondent James Piper and against petitioner, E. D. Bedwell Coal Company. The award as made was against the White Oak Coal Company, a corporation, and the E. D. Bedwell Coal Company. The White Oak Coal Company was by the award made primarily liable, and the E. D. Bedwell Coal Company was made secondarily liable.

Respondent moves to dismiss the petition upon the ground that the White Oak Coal Company is not made a party.

The record discloses that the White Oak Coal Company did not appear at the hearing before the State Industrial Commission and in no way contested the claim for compensation. The record further shows that it paid compensation for about 16 weeks after the injury, after which it became insolvent and all its property was sold by a trustee. It carried no compensation insurance, and, therefore, can in no way be affected by this proceeding. There is no attempt to show that claimant did not suffer accidental injuries from which he became permanently totally disabled, in that he was rendered practically blind. So, if in this proceeding the award should be set aside as to the E. D. Bedwell Coal Company, the White Oak Coal Company would not be affected one way or the other. It would have nothing with which to pay the award if it be affirmed. Nothing could be gained or lost by either party by having the White Oak Coal Company made a party to this proceeding.

The only question presented by the petition to review is whether or not the E. D. Bedwell Coal Company is liable. It is not necessary to have the White Oak Coal Company before this court to determine that question. It is not a necessary party and the motion to dismiss must be and is hereby denied.

The status of claimant and his relation to petitioner arises from a somewhat complicated transaction, shown by the record substantially as follows:

The petitioner was for a number of years prior to the origin of this claim the owner of the coal mining rights in certain land in Le Flore county. Petitioner had, either by mining itself or in connection with others, built up and established a widely advertised and well-known business and market, having a certain kind of coal known as "Panama Machine Cut Boom Loaded Coal," which was produced from the lands owned or leased by it and existed in and under adjoining land. It had leased some land in which it held the coal mining rights to a company known as the Buck Creek Mining Company, which had turned over or assigned its right to Messrs. Adams & Harper, who operated a mine thereunder for a while under the name of the Upper Vein Coal Company. After some time Harper got out of the enterprise and Adams operated the mine for a time as an individual. Thereafter a Mr. Hetherington came in as a partner, and they were operating under some kind of a contract with E. D. Bedwell Coal Company, dated May 5, 1928, the terms of which are not disclosed by the record. Thereafter Adams and Hetherington incorporated the White Oak Coal Company, and with the consent of the E. D. Bedwell Coal Company, assigned their contract to the White Oak Coal Company. Sometime prior to June 14,

1928, the White Oak Coal Company acquired some coal land adjoining that upon which the Buck Creek Mine was located. On June 14, 1928, the E. D. Bedwell Coal Company and the White Oak Coal Company entered into a written contract in which the E. D. Bedwell Company is referred to as a party of the first part and the White Oak Coal Company party of the second part. The material parts of said contract are:

"Whereas, party of the first part has built up a well-known and well-advertised business and market for Panama Machine Cut Boom Loaded Coal, and whereas, it is necessary for it to have available production of coal in adequate amounts which it can sell under such designation and description, and for which it shall act as sales agent;

"And whereas, it is therefore part of its business to secure aid in, and assist financially the production of said coal by others to the end that it can act as sales agent therefor;

"Now, therefore, in consideration of the mutual covenants herein contained, to be performed by the respective parties it is agreed:

"(1) Party of the second part proposes and agrees to open at least three mines upon the following described real property located in Le Flore County, Okla., to wit: * * *

"It being the owner of the coal under said described land. It is mutually agreed that said three mines to be so opened by party of the second part shall be operated by it in connection with its present mine and which it holds under a sublease from the E. D. Bedwell Company, and which is known as the Buck Creek Mine, situated in the northwest quarter of section 19, township 8 north, range 25 east.

"It is further mutually agreed that party of the second part needs the following equipment for the proper operation of the said three mines to be opened and to further increase production of the Buck Creek Mine, to wit: * * *

"Party of the first part on its part agrees that in order to enable party of the second part to purchase such equipment, that it will indorse or sign as surety at the Merchants National Bank of Fort Smith, Ark., the promissory notes of party of the second part in an amount not exceeding $1,800. And party of the second part agrees that it will use the money so borrowed by it from the Merchants National Bank in purchasing such equipment.

"In order to secure party of the first part for signing said notes as indorser and for surety, including any and all renewals thereof and in order to secure any and all indebtedness which party of the second part may at any time owe to party of the first part during the time that any of said notes or renewals thereof remain unpaid, and in order to secure the performance by party of the second part of the other terms and conditions of this contract, party of the second part has concurrently herewith, and as a part and parcel of this contract, executed and delivered to party of the first part a real and chattel mortgage, copy of which is hereto attached.

"(2) Party of the second part expressly agrees for itself, its successors, lessees, sublessees and assigns, that the party of the first part, its successors or assigns, shall act as the exclusive sales agent for the coal produced from the real property above described now owned by party of the second part, and shall continue to act as such sales agent until all available coal underlying same shall have been mined out. Party of the first part shall have entire charge of all matters pertaining to sales, using its best judgment on all sales matters to promote the mutual interests of both parties; and party of the first part hereby agrees to use its best efforts to sell the coal produced by party of the second part.

"Party of the first part guarantees all accounts for sales of coal so made by it, so that the party of the second part shall not suffer any loss by reason of the party of the first part selling their coal to some unreliable person, provided that in case there is any loss by reason of allowances or credits on account of poor preparation or quality of coal, then the party of the first part shall not be responsible for any losses so occasioned.

"Party of the first part shall receive and party of the second part hereby agrees to pay to party of the first part eight per cent. (8%) of the amount that is received for all coal sold from the above described land now owned by party of the second part.

"Party of the first part shall settle with party of the second part for all coal mined and shipped in the first half of any one month on the first of the following month, and for all coal mined and shipped in the second half of any month on the 15th of the following month, deducting therefrom the 8 per cent. of the amount which they have received from the coal, as well as any other deductions permitted by this contract or that may be agreed upon by the parties from time to time.

"(3) Party of the second part agrees to produce and ship good merchantable coal and also agrees to fill orders in compliance with instructions from the party of the first part from day to day, and to bill out the coal in conformity with its orders and routing instructions.

"(4) The party of the second part agrees to operate the three mines to be opened by it on its property, also any other mine or

mines which may be hereafter opened on said property, continuously and at all times in a diligent and workmanlike manner. By continuous operation, it is meant that the party of the second part shall operate the mines on the above property each day that they have cars and orders for the coal except upon such days that there may be mine accidents, machinery break-downs, labor troubles; and, in case of such accidents, break-downs or labor troubles, the party of the second part specifically agrees to use all diligence towards repairing said break-downs or mine accidents and also to settle any mine disputes.

"(5) A written contract, dated the 5th day of May, 1928, has heretofore been entered into by and between the E. D. Bedwell Coal Company, party of the first part, and Jack Adams, Jim Adams and John Hethrington, partners, doing business as Upper Vein Coal Company, reference being hereby made to said original contract for the terms thereof. Parties of the second part to said contract are incorporators and stockholders of the White Oak Coal Company, and are its managing officers and they have, by and with the consent of the E. D. Bedwell Coal Company, assigned said contract of the 5th day of May, 1928, to the White Oak Coal Company, said corporation, party of the second part hereto, has assumed the performance of said contract.

"It is not intended by this contract to rescind said contract of the 5th day of May, 1928, and same shall continue in full force and effect, except that the last paragraph thereof is hereby rescinded and there is substituted in lieu thereof the following:

"It is mutually agreed that all coal mined by party of the second part from the three mines to be immediately opened by them upon the above described land now owned by them, together with all coal which shall be mined from two additional mines to be hereafter opened therein, shall be loaded over the tipple belonging to party of the first part and described in said contract of May 5, 1928, provided, however, that the use of said tipple for said purpose shall not interfere with the efficient operation of said Buck Creek Mine under the terms of said contract of May 5, 1928; and provided, further, that when the production from said Buck Creek Mine and the mines to be opened by party of the second part becomes sufficiently great, then party of the second part shall make, at its own expense, all necessary improvements and additions to said tipple to enable it to efficiently load coal from all of said mines over said tipple."

On July 6, 1929, while working in a room in the mine located on the land owned by the White Oak Coal Company, claimant received the accidental injuries, resulting in permanent total blindness in both eyes, upon which this claim is based.

The White Oak Coal Company did not carry compensation insurance; the reason given being that it could not obtain such insurance, presumably because of its poor financial standing. It paid claimant compensation for 16 weeks at $18 per week. Thereafter, for some cause not made clear by the record, a trustee was appointed for the White Oak Coal Company and all of its property of every kind and character was sold by said trustee to another corporation known as the G. & H. Company. In such sale the G. & H. Company assumed indebtedness of the White Oak Coal Company in the sum of approximately $63,218.00, and paid the White Oak Coal Company $16,000 cash. Incidentally the White Oak Coal Company overlooked the compensation due claimant as one of the claims against that company, and the trustee, not knowing thereof, never informed the purchaser, so that the G. & H. Company when it purchased the property of the White Oak Coal Company had no notice of Piper's claim.

The White Oak Coal Company also overlooked making any provision for the payment of claimant's compensation out of the $16,000 received by it for the sale of its property. Instead the greater portion thereof was used to repay certain money to the wife of Adams, which it was claimed she had advanced, either to her husband individually or to the company, and perhaps some to the partnership before the company was organized. The balance of the $16,000 is not accounted for.

The G. & H. Company became insolvent and the property bought by it apparently passed to the E. D. Bedwell Coal Company. Sometime after the original claim was filed with the State Industrial Commission, the E. D. Bedwell Coal Company was made a party to the proceeding. The G. & H. Company had been made a party theretofore, but the claim was subsequently dismissed as to it. The record discloses that the E. D. Bedwell Coal Company indorsed notes as provided in the contract and the White Oak Coal Company received the last of the money obtained by it under said contract about August 2, 1928, at which time the E. D. Bedwell Coal Company wrote Mr. Jack Adams, secretary of the White Oak Coal Company, as follows:

230

"Ft. Smith, Arkansas.
"August 2d, 1928.

"Mr. Jack Adams,

"Panama, Okla.

"Dear Sir:

"We enclose herewith duplicate deposit slip on note to the bank for $6,300, less $126 interest, net $6,174. We have to-day made your check payable to the E. D. Bedwell Coal Company for $6,108 net as follows:

"$2381.25, to the Engineering Works.

"1479.83, to the Illinois Steel Company.

"2300.00, to the Ottumway Iron Works.

"This winds up all bills and it also winds up the credit at the bank, and it is now up to us to 'paddle our own canoe.' I certainly hope that you can get on your new day wage scale down there and use every effort to cut down expenses in every way possible.

"Up at this end I am going to do everything in the world I can although prices are going to be less in August, and in fact I do not think we will see the prices this year any time that we saw last year, but with everybody doing their best I think that things will come out all right.

"In talking with the bank to-day I told them that I advanced $1,300 for your first half payroll against the last half of July coal, but that you advised that you could take care of this out of your last half July coal."

The record further discloses that all coal mined by the White Oak Coal Company was disposed of according to the contract, and that the mine was operated, as to the amount of coal mined, and when the mine was kept running, substantially under the directions of the E. D. Bedwell Company, that is, it told the White Oak Coal Company when to open and when to close down the mine, notified it when and how much coal had been contracted for by the Bedwell Coal Company to purchasers, when and where to ship the coal, how many cars to load, etc. When contracts for sale were not on hand, the mine would be closed down.

At the close of the hearing, the State Industrial Commission made findings of fact. The finding complained of is as follows:

"That at the time of said injury herein, the White Oak Coal Company and the E. D. Bedwell Coal Company were joint adventurers in the operation of said mine."

Petitioner contends that there is no evidence whatever to support the finding of the Commission that the petitioner and the White Oak Coal Company were joint adventurers in the operation of the mine. They also contend that there is no author-

ity of law, under the facts of this case, for holding the E. D. Bedwell Company secondarily liable. But it is conceded that if the two companies were joint adventurers, the award should be affirmed. This is true. It would make little difference whether the E. D. Bedwell Coal Company be held primarily or secondarily liable, since it clearly appears that the White Oak Coal Company is wholly insolvent and unable to respond to plaintiff's claim for compensation.

The principal question to be determined is whether or not there is sufficient evidence to support the finding above set out.

There is no fixed rule by which to determine when the relation of joint adventurer exists. But it is quite generally held that if the parties have created and engaged in a joint enterprise, although it may relate to a single transaction, the law of partnership applies between and among the parties and in their relation to third parties. O. K. Boiler & Smelting Co. v. Minnetonka Lbr. Co., 103 Okla. 266, 229 P. 1045.

Petitioner asserts that before the relation of joint adventurer can exist, there must be an intention to form a partnership. This assertion we think is too broad.

In Jackson v. Hooper, 76 N. J. Eq. 185, it is held:

"1. While a business carried on by two or more persons for a profit with a community of interest, and a share of profits and losses, is essentially a 'partnership,' these requirements may exist without creating a partnership, and there can be no partnership unless the agreement contemplates an agency whereby each is the agent for the other or others.

"2. A 'joint adventure' may exist where persons embark in an undertaking without entering on the prosecution of the business as partners strictly, but engage in a common enterprise for their mutual benefit. * * *"

Generally it is said that a joint adventure is a special combination of two or more persons where in some specific venture a profit is jointly sought without any actual partnership or corporate designation. 33 C. J. 841; Dexter & Carpenter, Inc., v. Houston, 20 Fed. (2d) 647.

It is next asserted that there must be a participation in both profits and losses. Again, the assertion is too broad. Many cases might be cited where a joint adventure was held to exist when one of the parties, while entitled to share in profits, if any, was not obligated for any loss.

Warwick v. Stockton, 55 N. J. Eq. 61; Read v. Shaffer, 249 Fed. 553.

It would appear from the above authorities that an agreement to share losses, if any, is not essential. The rate or ratio in which each shall share in the profits of a joint adventure may be fixed by the special contract.

The contract here involved is clearly one of joint adventure. It is in many respects like the one in Dexter & Carpenter v. Houston, supra. It was therein held:

"Agreement between two coal wholesalers to lend money to third person for purchase of particular mine, in consideration of which they were to receive exclusive agency for sale of mine's product for two years, held, a 'joint adventure'."

The contract here involved was evidently drawn by the E. D. Bedwell Coal Company. The preliminary clauses of the contract clearly show the object of the enterprise and that it was chiefly for the benefit of that company. It was recited that the first party had built up a well-known and well-advertised business and market for the particular kind of coal described; that it was necessary for it to have available production of such coal in adequate amounts which it could sell under such description. Then follows the following significant clause:

"And whereas, it is therefore a part of its business to secure, aid in, and assist financially the production of said coal by others to the end that it can act as sales agent therefor."

It is thus clearly indicated that said company was in need of a greater supply of the particular kind of coal, in order to carry on its already established business. The White Oak Coal Company being the owner of the coal mining rights to said lands adjoining that upon which the E. D. Bedwell Coal Company had a lease, and upon which the incorporators of the White Oak Coal Company were already operating a mine under some sort of a contract with the E. D. Bedwell Company, but unable to purchase machinery and equipment necessary to enable it to open and operate additional mines on said land, was in need of financial assistance. This being a part of the business of the E. D. Bedwell Coal Company, it entered into this contract to "secure, aid in, and assist financially" the White Oak Coal Company, to enable it to produce additional coal for the benefit of the E. D. Bedwell Coal Company. Of course it was intended or hoped thereby that both companies would mutually profit by the enterprise.

Instead of lending its own money, the E. D. Bedwell Coal Company procured the bank to make the loan and indorsed the notes of the White Oak Coal Company to the extent of $18,000, and took the real and chattel mortgages on all the property of the White Oak Coal Company to secure it against possible loss on account of such indorsements. It is argued that, although we should treat the money as having been loaned directly by the E. D. Bedwell Coal Company, only the relation of borrower and lender was thereby created. This might be true if the contract went no further. But considering the nature of the entire transaction, the E. D. Bedwell Coal Company knew that the money thus advanced became subject to the risks of the business and could be repaid only out of the profits of the business or the property itself. The contract provided that the E. D. Bedwell Coal Company should act as the exclusive sales agent for the coal produced and should have entire charge of all matters pertaining to sales, using its best judgment on all sales matters to promote the mutual interest of all parties. The White Oak Coal Company was to fill orders in compliance with instructions from the E. D. Bedwell Coal Company from day to day and bill out the coal in conformity with its orders and route instructions. In the contract the White Oak Coal Company agreed to operate the mines continuously, but continuous operation was defined to mean "each day they have cars and orders for coal."

Thus almost complete control of the entire enterprise, except the physical act of mining the coal, was in the E. D. Bedwell Coal Company. It had complete control of the sale of the coal, including the fixing of the price to be obtained, using its best judgment in such matters. Its prospective profits were to be obtained from the eight per cent. of the sales price, less expense of selling. The prospective profits of the White Oak Coal Company were to be derived from 92 per cent. of the sales price, less operating expenses. If the expense of selling the coal exceeded eight per cent. of the sales price, the E. D. Bedwell Coal Company would lose, although the White Oak Coal Company might at the same time be making profits. If the expense of mining the coal exceeded the 92 per cent. of the sale price, the White Oak Coal Company would lose, and at the same time the E. D. Bedwell Company might be making a profit.

Joint adventures being special combina-

tions of two or more persons where, in some specific venture, a profit is jointly sought without any actual partnership designation, there is no reason why the parties by special agreement could not limit their respective profits and provide by their specific contract which particular part of the expenses each party should bear before participating in any profits.

When the entire scope of the enterprise is taken into consideration, together with the manner of carrying it out, so far as shown by the evidence, the State Industrial Commission was not without evidence reasonably tending to support its finding that, at the time of the injury herein, the White Oak Coal Company and the E. D. Bedwell Coal Company were joint adventurers in the operation of the mine.

The petition to review is denied, and the award of the State Industrial Commission is hereby affirmed.

HEFNER, CULLISON, SWINDALL, ANDREWS, McNEILL, and KORNEGAY, JJ., concur. LESTER, C. J., and CLARK, V. C. J., absent.

Note.—See under (1), 15 R. C. L. 500, 502; R. C. L. Perm. Supp. p. 3941; R. C. L. Pocket Part, title Joint Adventures, § 2.