**FIRST MECHANICS BANK OF TRENTON, N. J., et al. v. COMMISSIONER OF INTERNAL REVENUE.**

**No. 5775.**

Circuit Court of Appeals, Third Circuit.

June 29, 1937.

276

Edmund S. Kochersperger, of Washington, D. C. (Richard Stockton, 3rd, of Trenton, N. J., of counsel), for petitioners.

Frank J. Wideman, Asst. Atty. Gen., and Sewall Key, Norman D. Keller, Lucius A. Buck, and S. Dee Hanson, Sp. Assts. to the Atty. Gen., for respondent.

Before BUFFINGTON, DAVIS, and THOMPSON, Circuit Judges.

DAVIS, Circuit Judge.

This is an appeal from an order of the Board of Tax Appeals holding the petitioners liable for a deficiency of $20,179.53 in the income tax return of J. Philip Bird, for the year 1928.

The liability of the petitioners for the alleged deficiency depends upon the nature of the relationship between J. Philip Bird and the Canadian Car & Foundry Company, Ltd., hereinafter called the Canadian Company. If Bird was an employee, as the Board found, then its order should be affirmed. If, however, he was a partner or joint adventurer with the Canadian Company, then the petitioners are not liable for the alleged deficiency, and the order of the Board should be set aside.

The facts were stipulated by the parties. Bird "had been engaged in the manu-

facturing business since his early youth and in 1914 not only was a manufacturer but also was the general manager of the National Association of Manufacturers and enjoyed a very wide acquaintance among American manufacturers."

In the fall of 1914 he "obtained a contract to sell to the Imperial Russian Government 1,000,000 three inch shrapnel shells complete, at the price of $12.50 each. Up to the time of his contract all ammunition of that nature had been manufactured in the United States only at the Government's arsenals and there was no existent private manufacturer in our country which either was in that business or was capable of undertaking such a contract."

Bird, however, was in a position to complete the contract because of his wide acquaintance with manufacturers. He "employed engineers and draftsmen to prepare complete, detail working drawings of the various component parts of the shell" and "peddled out" the work of making the component parts and final assemblage among "some sixty to seventy American manufacturers." He had used this system to fulfill a contract with the United States Post Office Department for a complicated machine comprising several hundred parts "with such success that he received a bonus for completing the contract short of the fixed time."

While Bird was performing this contract, the Allison Supply Group (with which the taxpayer then had no connection) entered into a contract with the Russian government for 2,000,000 identical shells at $17.50 each. This contract was sold to the Canadian Company. In January, 1915, representatives of the Canadian Company came to the United States and endeavored to find American manufacturers who could perform the contract for them, as the Canadian Company had no plant or organization of its own which was capable of making the shells. After spending a month in New York without success, they were ready to leave and abandon their contract. They then learned of the contract of Mr. Bird, and of how he intended to solve the problem of supplying the shells.

"Accordingly, the representatives of the Canadian Company entered into negotiations with the taxpayer for the pooling of their interests on the precedent condition that the taxpayer would obtain the cancellation of his contract for the 1,000,000 shells at the lower price. The taxpayer so arranged, and it was then agreed that the taxpayer would turn over all of his property and organization that he had acquired and perfected including drawings, tools, gauges, arrangements made with the American component-parts manufacturers and everything connected with his contract; he was then to assist in the performance of the 2,000,000 shell contract and any other contracts that the Canadian company might obtain, during the year following, with the Russian Government; the taxpayer was to participate in the profits from all such contracts on the basis of 15 per cent. of the profits from the contract for the 2,000,000 shells and 5 per cent. of the profits from any other such contracts so obtained within one year. The taxpayer performed his part of the agreement. * * * "

An American corporation called "Agency of the Canadian Car & Foundry Company, Limited" was formed to which the 2,000,000 shell contract was assigned. Bird was made a director, general manager, and a member of a special committee in charge of matters relating to the 2,000,000 shell contract.

The Canadian Company also received a contract for 2,500,000 high explosive shells and 500,000 shrapnel which was turned over to the American corporation and in which Bird was entitled to a 5 per cent. share of the profits under the contract.

"In the Spring of 1916, due to financial reorganization and the responsibility of the British Government for the conduct of the finances of the Russian Government, the British insisted that an army officer be placed in immediate charge of the performance of the contracts and accordingly, the taxpayer was removed from any official position with the 'Agency.' However, under his contract connection with the contract performance the taxpayer continued to the conclusion of the Russian contracts in co-operation with the army officer and with the officials of the Canadian company, assisting in the performance of the shrapnel and shell contracts. The facilities of the taxpayer that he had provided for the performance of his 1,000,000 shell contract, were utilized by the Canadian company and the 'Agency' in the performance of the contract for the 2,000,000 shells. * * * "

Deliveries under the 2,000,000 shell contract were completed in 1916. The manufacture of the 2,500,000 high explosives and 500,000 shrapnel was completed in January, 1917, but while awaiting shipment they were

destroyed by an explosion or fire at Kingsland, N. J.

On October 12, 1916, Bird wrote to the Canadian Company demanding an accounting and threatening court action. Two days later, the president of the Canadian Company replied stating that the books were open to inspection; addressed Bird as a "partner with us"; and promised that a settlement would be made. Relying upon assurances that a settlement would be made, Bird did not actually bring suit for an accounting until November 24, 1919. Mr. Justice Howard of the Superior Court sitting at Montreal, in an opinion handed down on June 30, 1921, among other things, found that Bird had fully performed his part of the contract; that he was entitled to an accounting; that the profits on the two contracts with the Russian government were to be computed separately, contrary to the contention of the Canadian Company which was the basis of the controversy between them; and entered orders accordingly. The issue here involves the profits realized from the contract for 2,000,000 shells which was completed in 1916.

On appeal by both parties to the court of Kings Bench the above findings were affirmed on April 25, 1922, though the decision was modified on other particulars.

An account was rendered on October 26, 1922. Bird contested the accuracy of the account. This resulted in protracted proceedings. and finally in a judgment for Bird in the sum of $312,723.46.

The Canadian Company appealed to the Kings Bench of Canada. Before the appeal was heard, however, the Canadian Company and Bird reached an agreement in 1928 whereby Bird accepted $200,000 as a compromise settlement.

In his income tax report for 1928, Bird reported a capital net gain of $164,169.78 which subtracted from $200,000 leaves $35,830.22, the cost of obtaining the $200,-000 settlement. On this taxable income Bird paid $20,646.22.

In 1931 the Commissioner assessed a deficiency of $20,179.53 against Bird on the ground that the $164,169.78 constituted ordinary income for the year 1928 and that this relation between Bird and the Canadian Company was one of master and servant and not one of partnership or joint venture. Bird appealed to the Board of Tax Appeals contending that the income, if any, was received within the meaning of the Revenue Acts, in 1916 and not in 1928, and demanded

a refund of $20,646.22 paid on $164,169.78 in 1928. Bird died in 1933 before the appeal was heard. The petitioners, executors of the estate of Bird, waived the statute of limitations to the extent of the alleged overpayment for 1928 as to any deficiency that might have been due because of Bird's failure to report the profit from these transactions in 1916.

The Board sustained the contentions of the Commissioner and from its order of redetermination the petitioners have appealed to this court.

■ As above stated the liability of the petitioners turns upon the nature of the relationship between Bird and the Canadian Company. The concept of a partnership has been long established in the common law. Joint venture, as a legal concept, however, is of comparatively recent origin. 33 Corpus Juris, 841. It has been defined as a "limited partnership; not limited in a statutory sense as to liability, but as to its scope and duration." 4 Words and Phrases, First Series, 3814. The relationship of a joint venture may exist where persons embark in an undertaking without entering upon the prosecution of the business as strict partners, but engage in a common enterprise for their mutual benefit. Each has the right to demand and expect from their associates good faith in all that relates to their common interests. Jackson v. Hooper, 76 N.J.Eq. 185, 197, 74 A. 130. The fact that the parties regarded each munitions contract as a separate undertaking indicates that the relation of the parties was that of a joint venture.

■ Whether or not the parties to a particular contract have, as between themselves, created the relationship of a joint venture depends upon their intention. 33 Corpus Juris, 845, § 16; Reid v. Shaffer, 249 F. 553 (C.C.A. 6). Again, "if the person rendering the services is himself the promoter or an original party to the enterprise, he has usually been held to have an interest therein as joint adventurer with the others, and especially so if he himself contributes capital to the enterprise." 33 Corpus Juris, 844, § 9. The element of profit sharing, though perhaps not conclusive, is also an important element in deciding whether or not a joint venture existed. 33 Corpus Juris 847, § 16. Though the contract did not provide for a sharing of losses, the absence of such an agreement is not decisive of the issue. Reid v. Shaffer, supra. Even with respect to partnerships

it has been held that, "where the parties have clearly manifested an intention to form a partnership the relation is not affected by a provision in the agreement whereby one of the parties undertakes to indemnify the other against any loss or liability incurred or arising out of the business." 47 Corpus Juris, 672, § 64. "It is entirely competent for partners to determine by agreement, as between themselves, the basis on which losses shall be borne * * * and agreements * * * limiting or eliminating the liability of particular partners as to expenses or losses, will be controlling as between the partners." 47 Corpus Juris, 791, § 233.

■ The cumulative effect of all of the facts of this case leaves no room for doubt that the relationship of joint venture was intended and created by the parties. These facts may be briefly summarized as follows: Bird was in a commanding position because he controlled the only available means to fulfill the munitions contract; he was an original party to the enterprise and contributed not only the tools, gauges, drawings, and the organization which he controlled, but also obtained the cancellation of a munitions contract of his own; he was made a director, general manager, and member of a special committee in charge of the contract for the 2,000,000 shells for which he received no salary, and, even after he no longer occupied an official position, he continued to take an active part in the enterprise; the contract was admittedly a "pooling" of the interests of the parties; the president of the Canadian Company addressed Bird as a "partner with us"; and he was entitled to share in the profits.

■ The income due each partner in a partnership, including a joint enterprise such as we have in the case at bar, is taxable to him for the year in which it was received by the partnership, whether or not it is distributed to him in that year, and the statute of limitations begins to run as to the partner from that time. Appeal of Fred Truempy, 1 B.T.A. 349; Appeal of Robert A. Faesy, 1 B.T.A. 350. Section 182 of the Revenue Act of 1934 (26 U.S.C.A. § 182) provides that: "There shall be included in computing the net income of each partner his distributive share, whether distributed or not, of the net income of the partnership for the taxable year."

This provision is found in substantially the same form in all the Revenue Acts.

■ It is clear, therefore, that Congress has seen fit to adopt the common-law view that a partnership is not a legal entity. It has consistently treated all income of a partnership as taxable to the partners, whether distributed or not, and has ignored the partnership as a taxpayer except for the purposes of information. Rossmoore v. Commissioner (C.C.A.) 76 F.(2d) 520, 521; Burnet v. Leininger, 285 U.S. 136, 52 S.Ct. 345, 76 L.Ed. 665. See, also, the long line of cases cited in 26 U.S.C.A., pages 683 to 690.

Prior to 1932 it had been held that joint venturers were taxable as partners and were taxable upon the income received by the joint venture whether or not such income was distributed. Walter S. Dickey v. Com'r, 14 B.T.A. 1295, 1306, affirmed Dickey v. Burnet (C.C.A.) 56 F.(2d) 917, certiorari denied 287 U.S. 606, 53 S.Ct. 10, 77 L.Ed. 527; D. H. Byrd v. Com'r, 32 B.T.A. 568, 571; Wild v. Commissioner (C.C.A.) 62 F.(2d) 777, 778; Reynolds v. McMurray (C.C.A.) 60 F.(2d) 843; Helvering v. Armstrong (C.C.A.) 69 F.(2d) 370. Notwithstanding the decisions establishing that principle, the Revenue Act of 1932 (section 1111(a) expressly included joint venture within the term "partnership." 26 U.S.C.A. § 1696 (2).

■ In the present case the contracts were completed in 1916. The profits were realized by the joint venture at that time and there was nothing conditional or contingent about their receipt. They were earned and paid. Bird, therefore, was legally entitled to his share of the profits which was $312,-723.46, and was taxable on that share although he did not actually receive it in that year. That he saw fit to compromise the amount due him for $200,000 in 1928 did not diminish his liability for taxes for 1916. Appeal of Fred Truempy, supra; Appeal of Robert A. Faesy, supra.

■ The Commissioner relies upon the case of United States v. Safety Car Heating & Lighting Company, 297 U.S. 88, 56 S.Ct. 353, 80 L.Ed. 500. That case is clearly distinguishable from the case at bar. In the Safety Car Heating Case the court held that so long as profits remained contingent and uncertain they were not taxable income. A mere expectancy does not constitute income. It must become "consummate and established" before it is taxable as income. Although the profits in that case had a potential existence in March of 1913, they did not become certain and unconditional

until the settlement in 1925 when they fully accrued and became taxable income for that year. No partnership or joint venture existed in that case and the provisions of the statute making partners liable for their share of the profits received by the partnership, whether or not distributed, were not applicable. In the case at bar the fact that a controversy arose between the joint venturers did not change the fact that profits, taxable income, had been received in 1916 by the partnership.

Bird, as a party to the joint venture received taxable income in 1916 and it follows that the order of the Board of Tax Appeals must be set aside, and the cause remanded to the Board, with directions to redetermine the tax in accordance with this opinion.