CATLETT v. JORDAN et al.

No. 33799.   Feb. 26, 1952.

Rehearing Denied April 23, 1952.

Application for Leave to File Second Petition for Rehearing Denied May 27, 1952.

*244 P. 2d 564.*

A. Francis Porta, El Reno, for plaintiff in error.

John Barry, J. H. Jarman, John Jarman, Jr., and Ed White, Oklahoma City, for defendants in error.

PER CURIAM. This is an appeal from a judgment of the district court of Oklahoma county, Oklahoma, in favor of the defendants. There, John G. Catlett was plaintiff, and Robert M. Jordan, A. R. Jordan and the Double R Drilling Company, a domestic corporation, were defendants.

It appears from the record that in 1935 Mr. Catlett, Harlan M. Joseph, Florence Caulk Grier and Mrs. Raymond A. Weisner and others became tenants in common in certain mineral interests in township fourteen (14) north, range one (1) west of the Indian Meridian in Oklahoma county, Oklahoma, by purchase from the Bart Royalty Company. These interests were individually owned by the purchasers and were scattered through several sections northeast of the town of Arcadia.

The interests of Mrs. Weisner, Mr. Joseph and Mrs. Grier were managed by Mr. Raymond Weisner and herein-

after these interests will be referred to as the "Weisner interests." The Weisners, Harlan M. Joseph and Florence Caulk Grier were residents of the State of Maryland.

Mr. Catlett had become acquainted with these people during the negotiations for the purchase of the interests of the Bart Royalty Company; and it was through this acquaintance that the plaintiff was able to acquire leases on their mineral interests for the defendants.

The defendants, Robert M. Jordan and A. R. Jordan, are brothers. The defendant, the Double R. Drilling Company, and the two brothers were engaged in the production of oil. Robert M. Jordan was the vice president of the Double R. Drilling Company and its executive officer. They desired to drill some wells in the area northeast of Arcadia and learned that the plaintiff, who was theretofore unknown to them, could be instrumental in obtaining leases on the Weisner interests and opened negotiations with him for that purpose. The leases were obtained through the acquaintance, assistance and influence of the plaintiff.

The plaintiff alleged in his second amended petition that he was engaged in the business of buying, selling and brokering oil and gas mining properties; that the defendants were engaged as partners, joint adventurers or otherwise in the business of buying, selling and developing oil and gas mining properties; that in the fall of 1943 the plaintiff and defendants entered into an oral agreement for the procurement and development of a block of leases in township fourteen (14) north, range one (1) west of the Indian Meridian in Oklahoma county, Oklahoma; that under such agreement the plaintiff, on the one hand, and the defendants, on the other, were to share the costs of such leases equally, and each was to own an undivided one-half interest therein; that the plaintiff fully performed his part of the agreement

and obtained the leases requested by the defendants; that at various times in the process of obtaining such leases the original oral agreement was altered in writing, and in lieu of an undivided one-half interest as to certain leases procured under such written alterations, the plaintiff took other property or cash considerations; that the contract, insofar as the defendants were concerned, was wholly and fully performed except with respect to an oil and gas lease upon the Weisner interests in and under,

The Northeast Quarter (NE¼) of Section Four (4), Township Fourteen (14) North, Range One (1) West of the Indian Meridian in Oklahoma County, Oklahoma;

that the plaintiff was entitled to be adjudged the owner of an undivided one-half interest in and to that lease, insofar as the same affected the mineral interest owned by Harlan M. Joseph, Florence Caulk Grier and Mary A. Weisner, approximately 16 royalty acres, upon his tender and payment of one-half of the cost of such lease.

The defendant, Robert M. Jordan, denied generally the allegations of the plaintiff and in addition thereto charged the plaintiff with laches and pleaded the statute of frauds. Robert M. Jordan also denied that there was ever any concert of action between himself and his brother, A. R. Jordan. The defendant, A. R. Jordan, denied generally the allegations contained in the plaintiff's petition and specifically denied that he was ever associated with the other defendants as partners or otherwise. The defendant, the Double R Drilling Company, denied the allegations of the plaintiff's petition, and by cross-petition sought recovery from the plaintiff of his proportionate part of the costs of the drilling of a well upon the lease in question by reason of his ownership, individually, of certain minerals thereunder which he had not leased to the defendants.

The issues raised by the cross-petition of the Double R. Drilling Company

were later resolved in the journal entry by agreement of the parties.

Each defendant filed a separate demurrer to the amended petition of the plaintiff, which was overruled with exceptions. After the usual action by the court on demurrers and motions, trial was had to the court. Upon conclusion of the introduction of evidence of the plaintiff, the defendants demurred thereto, which demurrer was overruled and exceptions allowed. Thereupon the defendants introduced evidence in support of their separate answers and all parties rested. After the cause was argued to the court, the court made the following findings: "The court finds the issue of facts in favor of the defendant and that they are entitled to judgment against the plaintiff." It is from this judgment that the plaintiff appeals.

It is seen from the pleadings and the evidence that plaintiff's theory of the case is that it was a joint adventure or partnership organized for the purpose of acquiring the leases; that the plaintiff was to contribute to the adventure his ability to acquire the leases and one-half of the cost of the leases; that the entire agreement over a period of time was performed by all the parties thereto except with respect to the one lease which is the subject of this action; that in equity he is entitled to enforce the provisions of the original agreement as to this one remaining item, by reason of complete performance on his part and practical performance on the part of the defendants.

On the other hand, it is contended by the defendants that plaintiff and defendants were not partners or joint adventurers; that if the purported oral agreement was made the same is in violation of the statute of frauds; that in a case of equitable cognizance a judgment of the trial court will not be disturbed unless clearly against the weight of the evidence.

Defendants' contention that the purported transactions were in violation of the statute of frauds is without merit.

In Abraham v. Slyman, 90 Okla. 31, 215 P. 931, we said that an oral agreement to share in the profits and losses arising from the purchase and sale of real estate is not within the statute of frauds; and the existence of such partnership and the interest of the parties therein may be established by parol evidence. This rule was followed in Florence v. Thompson, 92 Okla. 156, 218 P. 800. To the same effect is the holding in Ganas v. Tselos, 157 Okla. 107, 11 P. 2d 751. Therein it was contended that the oral agreement was indefinite, uncertain, and unascertainable and not sufficient as a basis of an action. In answering this contention, the court said:

"It is contended by the defendant that the court erred in rendering judgment on the basis that a partnership existed. The trial court found that after the purchase of the property at foreclosure sale the defendant and the plaintiff entered into an oral contract, whereby it was agreed that the plaintiff was to take charge of both of the leases and to operate and further develop them, and that whenever the plaintiff had advanced a sum equal to the investment of the defendant, less proper credits, the parties should become equal owners of the undivided interest in the leaseholds, and that the defendants would convey to the plaintiff an undivided one-half interest in the property. The court further found that the plaintiff took charge of the property and made improvements and expenditures under the agreement, and that such acts on the part of the plaintiff took the contract out of the statute of frauds and rendered it legal and enforceable, and that an action could be maintained for an accounting. We think the testimony is sufficient to warrant the finding of the trial court that such a contract existed."

In Kasishke et al. v. Keppler, 158 F. 2d 809, it was held that on oral contract whereby plaintiff was to use his talent as a geologist in locating and recommending oil and gas properties to the defendant therein who was to undertake acquisition and development of property and plaintiff was to receive an interest in the properties

acquired after defendant had been reimbursed for expenses created a joint adventure under Oklahoma law, and cited Florence v. Thompson and Abraham v. Slyman, supra, in support of this conclusion. See, also, Kasishke v. Baker, 146 F. 2d 113, and cases cited therein, which announces the rule applied in the Kasishke v. Keppler case, supra.

Therefore, the only question of merit raised by the parties herein is: Was the judgment against the clear weight of the evidence? If not, the judgment must be sustained.

In order to determine this issue, this being an action of equitable cognizance, we must consider the whole record and weigh all of the evidence, and, if then it is found that the judgment is against the clear weight thereof, it becomes our duty to render or cause to be rendered, the judgment that should have been rendered in the trial court.

The evidence in this case consists of the testimony of Mr. Catlett for himself, and Robert M. and A. R. Jordan in their behalf, and documentary evidence consisting of letters, agreements, contracts, payments and assignments of mineral interests.

Defendants did not deny having solicited plaintiff's assistance to obtain the leases from the Weisner interest. They admittedly desired to drill some oil wells in the area northeast of Arcadia, which included the Weisner interests, and they admittedly learned that the plaintiff, whom they did not know, could, through his acquaintanceship and influence with the owners of the Weisner interest, obtain leases for them thereon, and the leases were admittedly so obtained.

The plaintiff testified that he was to have a one-half interest in all the leases obtained from the Weisner interests; that his contribution to be made to this joint adventure, or partnership, in addition to his payment of one-half the cost of the leases, was his knowledge of the whereabouts of the owners of the Weisner interests, and his acquaintanceship with these owners from whom the leases were to be acquired, and his ability to procure the leases; that defendants were to contribute the development of the properties (which included drilling oil wells); that the entire agreement was performed to the satisfaction of all parties except as to the lease on N. E. ¼, sec. 4-14N-1W; that he did contribute his time, money, acquaintanceship and influence and by reason thereof the leases on the Weisner interests were acquired.

The record discloses without doubt that the defendants relied upon the personal influence of Mr. Catlett and took advantage thereof in the procurement of leases on the Weisner interests.

It was shown that while the first group of leases were still in possession of the grantors (Weisner interests) for execution, the defendants concluded that they wanted the leases in their own name because Mr. Catlett was also in the drilling business and that plaintiff acquiesced in this conclusion. There can be no dispute but that in consideration of the plaintiff's acquiring those leases (the first group), the defendants compensated the plaintiff by the assignment and conveyance to him of leases and overriding royalties, which the plaintiff claims was in lieu of his one-half interest in this first group of leases.

With reference to this first group of Weisner interest leases Robert M. Jordan, on September 24, 1943, wrote a letter to Mr. Catlett in which he said:

". . . I will come to Tulsa when you say that same has been returned to you and work out with you the other details including outside acreages and override, which will be kept confidential by me."

Continuing the thought in the above letter and in consideration of plaintiff's having acquired, executed and delivered the lease therein described on

the 1st day of November, 1943, Robert M. Jordan wrote Mr. Catlett as follows:

"Nov. 1, 1943
"Mr. J. G. Catlett:

"In consideration of your acquiring and executing oil and gas leases on your acreage in block in 14N-1W, A. R. Jordan agrees to secure for you oil and gas lease on S½ SW¼ 13-14N-1W, for $10 per acre to you to reimburse him for cost of same; provided, however, if A. R. Jordan is not able to secure said lease, he will give you an O. R. of 76/160 of 1/8 of 7/8th under the E½ NE¼ 14-14N-1W.

"(Signed)   Rob't M. Jordan

"Receipt of leases above mentioned is acknowledged.

"R. M. J.

"Your man to have access to derrick floor and location at all times.

"R. M. J."

The record, which is not disputed, discloses that A. R. Jordan was unable to deliver the lease in accordance with the above agreement made by Robert M. Jordan, and thereafter assigned to Mr. Catlett an overriding interest in the N. E. ¼ of 14-14N-1W and paid him approximately $3,000 in cash.

The record further discloses that a second group of leases was obtained; that pursuant to written instructions from Robert M. Jordan to Raymond A. Weisner, Weisner drew a draft for the agreed bonus upon Mr. Catlett through the First National Bank of Tulsa, Oklahoma; that Mr. Catlett paid the draft and held the leases about eight months, at which time Mr. Catlett was paid $1,300 for the leases. They were taken in the name of A. R. Jordan. The payment was to reimburse Catlett for the money he paid for the leases and to purchase his one-half interest therein.

The record further reveals that during the period of negotiations for the above leases the Jordans, through Mr. Catlett, had been introduced to Mr. Weisner, the manager for the Weisner interests, and that they had obtained leases on the Weisner interests in sec-

tions 3 and 4 in 14N-1W. The lease in section 3 was taken in the name of A. R. Jordan. The one in section 4 was taken in the name of Robert M. Jordan and later assigned to the Double R. Drilling Company.

Mr. Catlett for his interest in section 3-14N-1W was paid $50,000 in cash by A. R. Jordan, and in addition thereto, A. R. Jordan conveyed to Mr. Catlett valuable mineral rights in section 3; the agreed aggregate value of the cash paid and mineral interest was $80,000 or $90,000.

Thus, it is evident that on three different occasions the defendants recognized, acknowledged and paid the plaintiff for his interest in leases acquired from the Weisner interest, which plaintiff contends was through and by virtue of an oral agreement between him and the defendants, whereby he was to obtain the leases and defendants to develop them and he to have a one-half interest therein, which, however, was denied by both defendants in their answers and they so testified.

In this connection Robert M. Jordan contended that he was not connected in any way with the plaintiff, or A. R. Jordan, his brother; that there was no partnership agreement or joint adventure between him and plaintiff, or his brother; that he obtained the lease on section 4, and assigned it to the Double R Drilling for a valuable consideration.

Robert M. Jordan testified that he personally had never had any dealing with plaintiff except for his brother, and that the leases obtained for his brother, through him, were in the capacity of attorney for his brother, A. R. Jordan.

But this contention is not borne out by the record and Robert's testimony is in direct conflict with his prior letters, one of which reads as follows:

"July 10, 1944
"Mr. R. A. Weisner,
"1004 South Division St.,
"Salisbury, Md.

"Dear Mr. Weisner:

"I thank you for your letter of July 8, together with enclosure of plat showing mineral interests unleased by your associates in 14 North, 1 West, which, according to my records, amounts to 64.60 acres. I enclose herewith original and copy of three separate oil and gas leases, the first lease being for a term of two years from date, the second lease to A. R. Jordan and Jordan Bus Company for a term of five years from date and covering your 7.65 acre interest in section 12, Tract No. 573. The reason for the five year lease on this particular tract is that A. R. Jordan has a five year lease on the remaining interests in this tract.

"The third lease is the lease which is now owned by Phillips Petroleum Company, in Section 4, your Tract No. 536, which expires September 19, 1944. We have a part of this tract under lease, and since Phillips has a part under lease for five years, I am asking you to give us a five year lease on this particular tract. I know that you and your associates desire development, and of course, along with our tax program, we want to develop the properties as quickly as expedient, and particularly within the next year and a half.

"For your information, although I believe I told you over the telephone this morning, we are drilling a well one-fourth of a mile due south of the discovery well, and it is drilling at 4400 feet, one well east of the discovery well drilling at 2000 feet. We have set surface pipe on the southeast of the discovery well, and are deepening our No. 1 well, which is a small producer in the Dolomite. I sincerely believe that we will get a good well out of this, and if so, it will prove up with a reasonable degree of certainty all of your acreage within Sections 10, 11, 12, 13, 14 and 15, which we have under lease.

"The lease price to you as mentioned in our telephone conversation and by letter was $25 an acre for a complete lease on the whole block for a term of two years, and I hope that the fact that I put in two five-year leases on the two tracts mentioned herein will not be deterrent to the deal, provided, however, that you take the matter up with your associates and they are willing.

"This letter, of course, is binding on me, but is not on you and your associates, because I want to give you every opportunity to lease to somebody else for a higher figure if you desire to do or can obtain a better offer. I do think, however, and I believe you agree with me, that considering equality in prices and considering the fact that we are taking a lease on the whole block, that you and your associates will give us first opportunity, as mentioned in your letter, which courtesy I appreciate.

"Thanking you for your past co-operation, I remain

"Yours very truly

"RMJ:VJ          Robert M. Jordan."

Robert M. Jordan in writing the above letter used the pronoun "we," obviously meaning A. R. Jordan, Robert M. Jordan and Double R Drilling Company, who were doing the development (drilling), when he said:

"We have set surface pipe on the Southeast of the discovery well and are deepening our No. 1 well which is a small producer . . . I sincerely believe we will get a good well out of this, if so, it will prove up with a reasonable degree of certainty all of your acreage within sections 10, 11, 12, 13, 14 and 15, which we have under lease."

Unquestionably, these leases referred to in this letter included the leases made to A. R. Jordan through Mr. Catlett.

Thereafter, Robert M. Jordan wrote a letter to Mr. Catlett which reads:

"July 24, 1944
"Mr. J. G. Catlett
"Atlas Life Building
"Tulsa 3, Oklahoma

"Dear John:

"Enclosed please find Schulumberger log on our Williams No. 1.

"I received from Weisner and associates, last Friday, oil and gas leases for a term of two years covering their remaining one last mineral interest. I paid $25.00 per acre for these leases.

"I will probably be in Tulsa the latter part of this week or the first part of next week, and we will adjust all matters.

"Best regards, I am,

"Yours very truly
(Signed) "Bob Jordan
"Robert M. Jordan"

If Mr. Catlett was not considered as having an interest in these leases and Robert M. Jordan had never dealt with him except for his brother, why did he write such a letter and why did he enclose Schlumberger log on "our" Williams No. 1? What was there to settle? Mr. Catlett had already been paid for his interest in everything except the lease on section 4, which was the last lease obtained from the Weisner interest and evidently was the only remaining interest, or subject matter to be adjusted or discussed.

Without further narration of the evidence, but after considering the whole record, we conclude that the judgment of the trial court is against the clear weight of the evidence and the judgment must be reversed and the cause remanded, with directions to vacate the judgment and render judgment in favor of plaintiff quieting his title to his one-half interest in and to the oil and gas lease now held in the name of the Double R Drilling Company upon the mineral interest of Harlan M. Joseph, Florence Caulk Grier and Mary A. Weisner in the N.E. ¼ of section four (4) township fourteen (14) north, range one (1) west of the Indian Meridian in Oklahoma county, Oklahoma, upon the payment of one-half (½) of the cost of such lease.

It is urged, however, that the arrangement herein did not constitute a partnership or joint adventure between plaintiff and defendants because there was no agreement to share the profits and losses and that the statute of frauds prevents a joint interest in the property; that the property was now owned by a corporation. This argument is untenable. In Ganas v. Tselos, supra, we said:

"It is not necessary for this court to determine whether the contract was one of partnership or joint adventure. There was an agreement to operate the property for the mutual benefit of the plaintiff and the defendant. Under the rule in this state, such an agreement may be shown by parol evidence, even though it amounts to a partnership. Nix v. Green et al., 95 Okla. 247, 219 P. 380; Abraham v. Slyman, 90 Okla. 31, 215 P. 931; and Forence v. Thompson, 92 Okla. 156, 218 P. 800."

In the case of E. D. Bedwell Coal Co. v. State Industrial Commission, 157 Okla. 227, 11 P. 2d 527, we held that there was no fixed rule by which to determine when the relation of joint adventure exists. Therein it was urged that before the relation of joint adventure can exist there must be an intention to form a partnership. We said such assertion was too broad and approved the rule that a "joint adventure" may exist where persons embark in an undertaking without entering on the prosecution of the business as partners strictly, but engage in a common enterprise for their mutual benefit. In the opinion we said:

"It is next asserted that there must be a participation in both profits and losses. Again, the assertion is too broad. Many cases might be cited where a joint adventure was held to exist when one of the parties, while entitled to share in profits, if any, was not obligated for any loss. Warwick v. Stockton, 55 N. J. Eq. 61, 36 A. 488; Reid v. Shaffer (C. C. A.) 249 F. 553.

"It would appear from the above authorities that an agreement to share losses, if any, is not essential. The rate or ration in which each shall share in the profits of a joint adventure may be fixed by the special contract."

Unquestionably, the arrangement between the parties herein was for their mutual benefit, Mr. Catlett to use his position, acquaintanceship, influence and time, paying half of the cost to obtain the desired leases and defendants to pay half and develop the same, and each owning an undivided one-half interest in leases acquired from the

Weisner interests. Each stood to lose something (that which they had put into the adventure); while entitled to share in the profits, if any, neither was obligated as to the total losses of the other. Clearly, a joint adventure arose by reason of this fact situation.

The rules applied above have been recognized by many courts of last resort and were applied in the case of Kasishke v. Baker, supra, wherein it was said:

"It is urged that the arrangement did not constitute a joint adventure. It is argued that this follows from the facts that Baker's interest was dependent upon the contingencies already noted; that there was no agreement to share the losses; that there was no equal right of management; that there was no joint interest in the property; that the contract was terminable at the will of either party; and that the enterprise was not limited to a specific venture.

"It is impossible to define the relationship of joint adventure with exactitude and precision. In many respects it is analogous to a partnership, the main difference being that a joint adventure is more limited in its scope of operations than a partnership. In the main, some of the relevant factors of a joint adventure are that there must be joint interest in the property; there must be an agreement, express or implied, to share in the profits and losses from the venture; there must be action and conduct showing co-operation in the property. It has been held that it is not absolutely necessary that there be participation in both profits and losses. In determining whether one shares in the losses, the fact that one works for a nominal salary, thus losing a part of the value of his services, will be taken into account. Oklahoma has held that a joint venture may consist in an agreement to do a single act or in an agreement to engage in some particular line of business.

"While it is possible to lay down the general characteristics of a joint adventure, in the end, whether a certain transaction constitutes such a relationship can be determined only from a full consideration of all the relevant facts and circumstances in each particular case. That the transaction in question is more limited in scope than a general partnership is evidenced by the finding that the Osage County leases were substantially developed in 1935, and that the proceeds therefrom were invested in the Russell County leases only after further consultation between Kasishke and Baker. . . .

"It is argued that under the established public policy of Oklahoma a corporation may not be a party to a joint adventure and that therefore in any event the transaction cannot be upheld. It may be conceded that a corporation may not enter into a general partnership agreement, but the law of Oklahoma is otherwise in regard to a joint adventure. Oklahoma has consistently held that a corporation may be a party to a joint adventure.

"It is quite clear that Coralena Oil Company and Olive Drilling Company were mere instrumentalities through which Kasishke carried on his personal business. All the stock in these companies, other than the qualifying shares issued to Baker, were issued to Kasishke and his wife. Moreover, all the stock issued to Mrs. Kasishke and to Baker was assigned by them and delivered into the possession of Kasishke. While the title to the property in question stood in the name of the corporations, it was in fact the property of Kasishke and of Baker, and the corporations were mere trustees for them."

Upon the whole record, and for the reasons stated, the judgment is reversed and the cause remanded, with directions to render judgment for plaintiff in detail as above set out.

HALLEY, V. C. J., and WELCH, GIBSON, DAVISON, JOHNSON, and O'NEAL, JJ., concur. BINGAMAN, J., dissents.