**SELECTED INVESTMENTS CORPORA-
TION, Plaintiff in Error,**

v.

**OKLAHOMA TAX COMMISSION,**
Defendant in Error.

No. 36731.

Supreme Court of Oklahoma.

March 12, 1957.

Rehearing Denied April 2, 1957.

Washington, Thompson & Wheeler, Oklahoma City, Louis Loss, Cambridge, Mass., of counsel, for plaintiff in error.

R. F. Barry, W. F. Speakman, E. J. Armstrong, Oklahoma City, for defendant in error.

WELCH, Chief Justice.

To the income tax or on the income tax return of the plaintiff, Selected Investment Corporation, for 1948 the Oklahoma Tax Commission in effect made or applied an added assessment on the sum of $543,215.35 earned by investments of money from the Selected Investment Trust Fund.

"Commission" contends this sum was an earning and income of Selected Investment Corporation, while "Corporation" contends it did not own the Trust Fund nor its earnings or income, and that the sum mentioned was the earnings and the income of "Trust Fund" as a separate legal entity, and that therefore such income is not taxable to plaintiff corporation.

The controversy first presents the question: Whether "Corporation" and "Trust Fund" are separate legal entities, and whether the income here involved was in fact and law the income of "Corporation" or the income of "Trust Fund" as a separate legal entity.

In considering that question we must examine the structure, ownership and operation of "Trust Fund" and of "Corporation." The Selected Investment Corporation was created by incorporating under Oklahoma Laws, and by receiving its charter as an Oklahoma Corporation. It is owned by its corporate stockholders and operated by its officers and Board of Directors in the usual manner of a corporation.

It was stipulated by the parties that "Corporation" was incorporated in 1930, and that the Articles of Incorporation as filed in the Secretary of State's office provided:

"* * * that the purposes for which the corporation is formed are to transact a general investment business, to create, manage and supervise under indentures or other contractual relationships, investments, trust funds, and the cash securities therein, and to issue certified bonds as evidence of the separate revocable trusts or participating interests, the holders of such certificates before any such funds are created, managed or supervised to designate the trustee therefor, to enter into, may perform and carry out contracts with any corporation so as to permit that person to buy, sell, hold, and deal in all kinds of listed and unlisted securities, and to loan money on real and personal property."

One of the business operations of "Corporation," or perhaps its principal business, was the management of trust funds as it was specifically authorized to do.

Now the structure, creation and operation of "Trust Fund" was about as follows: By advertising and soliciting, individuals were induced to make cash investments. The money so advanced, less a stated or agreed percentage to "Corporation" for its initial fee and/or expense was to be and was in fact deposited in a separate fund or deposit in a designated bank as a trust fund owned by the investors therein, the bank being designated as trustee thereof. This was done and "Trust Fund" was thereby created and implemented pursuant to a contract or indenture providing at length and in great detail for the trustee to receive the money and for the handling and operation of "Trust Fund." Provision was made for changing of the trustee in case the first trustee wanted to resign, or in case of certain other eventualities with provision for bonding the trustee. Each investor who advanced money to invest in, and thus to build up, "Trust Fund" was issued a certificate showing his investment, referring to the original trust agreement or indenture and making the investor a party thereto, and thereby the investor was made an owner of his proportionate share of the "Trust Fund." There was provision for the investor certificate holder to revoke the trust as to his part or share and to withdraw therefrom and to surrender his certificate and receive payment of his share

in the fund of the value of his proportionate share at that time. It was the money so advanced to such fund and so deposited in trust which created and constituted "Trust Fund."

The indenture or trust agreement provided that "Corporation" would manage and direct investments from "Trust Fund." The trustee had no authority to make investments from the trust fund or expenditure therefrom except such as were directed by "Corporation." The plan was that "Corporation" would select stocks and bonds or certain other properties or property interests or mortgages to be purchased for "Trust Fund" and held for income and interest to "Trust Fund," and for possible increase in value. Such stocks and bonds or other properties were the property of "Trust Fund." The purchase price therefor was paid by the trustee out of "Trust Fund" upon the direction of "Corporation." All income from any such stocks or bonds or other property interests went into "Trust Fund" and upon sale of any such items the sale price or money received therefor went into "Trust Fund." There was provision for certain periodical returns to be paid to the investor certificate holders out of "Trust Fund," and after such payment requirements had been fully met from earnings or income received by "Trust Fund" from its investments or purchases, then "Corporation" was to receive from "Trust Fund" a stated compensation or management fee for its services in managing "Trust Fund." This fee, as collected or received for managerial services, was income to "Corporation" and was so reported along with other income, if any, of "Corporation," and tax thereon paid. As to that, we do not understand it was contended otherwise. When stocks or bonds or other property items were purchased out of moneys in "Trust Fund" they were held by or for "Trust Fund's" benefit. When any such items were sold for profit, such profit did not go to "Corporation," but went to "Trust Fund" for its benefit or to or for the beneficial owners of "Trust Fund," that is, the certificate holders.

We think it is apparent that when money was accumulated in "Trust Fund," nothing was thereby added to the assets of "Corporation." When stocks or bonds or other property interests were so purchased as aforesaid there was no change in the assets of "Corporation." If stocks or bonds so purchased increased substantially in value, nothing was thereby added to the capital value or to the assets of "Corporation," but such increase in value inured to the sole benefit of "Trust Fund" and its beneficial owners. No income to "Trust Fund" or increase in value of its property investments was of any benefit to "Corporation" except insofar as it might percentage-wise effect the amount of compensation or management fee payable to "Corporation."

Over the years since 1930 many thousand investors had entered into and contributed to this plan or business venture. Many had received the returns promised at regular intervals and many had cashed out their certificates at a profit. In 1951 to 1953 when "Commission" made and charged and collected this added assessment against "Corporation" there were between six and seven thousand certificates outstanding against "Trust Fund" in varying amounts representing the aggregate contributions of about $23,000,000 to "Trust Fund."

While the business done was large, with very substantial profits and income, we do not understand that any of it was received into the assets of "Corporation" except its stipulated management fee based on stated percentage.

This overall plan was certainly designed and stated on paper to create two separate legal entities, one entity being the "Trust Fund" to receive and hold all moneys and property interests and income therefrom for its beneficial owners, and the other entity being "Corporaion" which for stated and agreed compensation managed the assets of "Trust Fund," but did not own them; and we are convinced that the day to day operations maintained the stated purpose and design of preserving the two separate legal entities.

We do not observe any contention that there is any law violation, or any illegality in the Articles of Incorporation or in the Indenture or Trust Agreement above referred to, or in the conduct of these business ventures.

As we understand it, these two entities maintained completely separate books and records and there was no commingling of books or records or moneys or assets. "Corporation" made no contribution to "Trust Fund" except by way of services rendered, and "Corporation" did not take or receive anything from "Trust Fund" except its stated and agreed compensation or fee for services rendered.

It is the position of "Corporation" that the earnings or income of "Trust Fund" are taxable, if at all, to "Trust Fund," wholly separate from the income of "Corporation," or that such earnings or income are taxable to the owners or certificate holders, and are in no event assessable against "Corporation." It is pointed out that this has been the position taken since 1930, and it is pointed out that "Commission" has accepted this view for a number of years and up to 1948.

In Oklahoma Tax Commission v. Liberty National Bank & Trust Co., Okl., 289 P.2d 388, this court held in effect that where the Oklahoma Tax Commission had since 1931 interpreted tax statutes as authorizing banks to use the reserve for bad debts method of writing off bad debts, such consistent administrative interpretation of the tax statute would prevail over the contrary interpretation suggested by "Commission" for the first time more than twenty years later. We find the principle there followed to be applicable here.

■ No case exactly in point with the question here involved is cited by either party. Consistently separate entities are recognized for tax purposes. This is so by statute, recognizing as separate entities, individuals, corporations, partnerships, trusts and estates, 68 O.S.1951 § 874, and by actions and decisions of taxing authorities and courts. At all times the labor has

been to determine to which entity the income should be charged or taxed. See Jones v. Norris, 10 Cir., 122 F.2d 6; Moline Prop., Inc., v. Commissioner of Internal Revenue, 319 U.S. 436, 63 S.Ct. 1132, 87 L. Ed. 1499, 1502; Burnet v. Commonwealth Improvement Co., 287 U.S. 415, 53 S.Ct. 198, 77 L.Ed. 399. Many other cases are cited by both parties where the courts labored with the same problem under various and varying circumstances. We think we need not cite or discuss those additional authorities further than to say that the court in each such case was called upon to determine, under the facts in each case, which entity actually earned and received the income and should be taxed thereon, with the decision in each case finally resting on the particular facts peculiar to each case.

"Commission" here emphasized the rule that "it is well settled law that a taxpayer cannot avoid taxes by employing a sham or subterfuge" and supporting cases are cited. We fully agree with that rule, but we cannot find that the business arrangement here is or results in a sham or subterfuge to avoid taxes, or in any sham or subterfuge at all. There is nothing to show that this business method or plan was designed or followed for any wrongful or unwholesome purpose.

■ We find and hold that it is well shown that "Corporation" and "Trust Fund" are separate entities, and that the items here involved constituted income to "Trust Fund" not taxable to "Corporation." Therefore the trial court erred in its holding, and reversal of its judgment must follow.

There is substantial discussion as to which item, or whether certain items are deductible in the income and tax calculation made by "Commission" in the reassessment here made against "Corporation," but since no such assessment may be properly made against "Corporation" on the income items here involved, we need not consider what the "Commission" might or should allow or determine as to deductions.

Reference is made to a specific sum of $53,714.92, and "Commission" emphasizes

the fact that this sum could have been charged by and paid to "Corporation" on its management fee, but instead that it was retained by or left in "Trust Fund" to aid it in redeeming certificates at par and a market for the sale of same thusly maintained. We deem this to be wholly unimportant to our determination here, since this sum was merely a part of the over-all sum earned in the first place by investments from "Trust Fund," and became and was an asset of "Trust Fund" like all other moneys remaining in the "Trust Fund" for the benefit of its owners, the holders of the certificates above mentioned.

The judgment appealed from is reversed, and the cause remanded with directions to render judgment for "Corporation."

WELCH, C. J., CORN, V. C. J., and DAVISON, JOHNSON, WILLIAMS and CARLILE, JJ. concur.

BLACKBIRD and JACKSON, JJ., dissent.

JACKSON, Justice (dissenting).

As I understand the majority opinion it holds that the "Trust Fund" here involved is a separate entity from Selected Investments Corporation and that the income from the Trust Fund is the income of the Trust Fund and therefore taxable against the Trust Fund.

The Contract or "Indenture" between the Corporation (Selected Investments Corporation), the Trustee, and the Certificate holders provides the original Trustee, appointed by the Corporation, will serve until such time as he may resign, or be removed by order of the Corporation, or by an instrument signed by more than 50% of the holders of the total face value of all certificates outstanding. In the event of removal or resignation of the Trustee his successor will be appointed by the Board of Directors of the Corporation. The duties of the Trustee are to keep the cash and securities constituting the investment or Trust Fund, and to authenticate certificates.

He is a custodian, performing only such functions as directed by the Corporation or provided in the Indenture. He receives and pays out money and makes investments as directed by the Corporation. He liquidates the investments when directed by the Corporation. He exercises no independent judgment in matters of policy. His duties are ministerial in nature to be performed as and when directed by the Corporation. His compensation is provided for in the Indenture and is based upon a small percentage per annum of the Investment Trust Funds.

As to the income earned by the investment of the Trust Fund in 1948, I am of the opinion it is immaterial whether the Trust Fund is a separate entity from the Corporation. Although the earned income resulting from the investment of the Trust Fund is collected by the Trustee and placed in the Trust Fund it is not the income of the Trust Fund.

Before an investor buys or invests in a "Trust Certificate Bond" he signs a purchase agreement. The purchase agreement provides that he is bound by the terms of the Indenture. The Indenture provides the Corporation will manage his investment. It further provides that corporation may charge on the last day of each half year of the fiscal year, as compensation for its services, a sum not greater than 2% of the aggregate actual value as of the last day of each half year of all shares represented by outstanding certificates on said last day of such half year. The Indenture further provides, however, that such compensation (2% as above) for management services shall not be levied against the Trust Fund until the certificate holders shall have received dividends at the rate of 6% per annum accumulative on their respective shares of the fund. In the event of liquidation of the Trust Fund the Indenture provides that those holding Trust Fund Certificates, at the time of liquidation, shall share ratably in any surplus earnings that may have accrued in the Trust Fund. Thus it is apparent that the

holders of Trust Fund Certificates have a contract right to receive each year the earned income of the Trust Fund up to 6%, or any earned fraction thereof. The Corporation has a contract right to charge 2% twice each year for its services, after the Certificate holders have first received their 6%.

As I view the Indenture it is immaterial whether the return to the investor is called "interest" or "dividends," or that the return to the investor may be less than 6% per year. There is a fixed contractual obligation on the part of the Corporation and the Trustee to pay out to the investor or Certificate holder the first 6%, or fraction thereof, that is earned by the investment of the Fund. Thus the Certificate holder is the only person who has made any profit on the investment of the Fund if only 6%, or less, is earned during the year by the investment of the Fund. Since the Certificate holder is the only person receiving any profit, and the Corporation and Trustee are under a contractual obligation to pay it, I am of the opinion that the Certificate holder is under duty to pay income tax on the earnings of his investment, whether it be called "interest" or a "dividend."

In 1948, after paying the Certificate holders 6% on their investments, the Corporation declined to claim all of its percentage or authorized compensation for its management services, but left $53,714.92 in the Trust Fund to create a surplus. Undoubtedly, under the Indenture, this was income earned by the Corporation for its management services upon which it should pay income tax. In leaving this $53,714.-92, as a surplus, in the Trust Fund the Corporation made a gift to their Certificate holders to be paid out in 1949, or subsequent years, in the form of "interest" or "dividends."

For the foregoing reasons, I must respectfully dissent.