**R. F. WORKMAN, Appellant,**

v.

**W. M. HARRISON, Trustee of Selected Investments Corporation and Selected Investments Trust Fund, and Capitol Gate, Inc., Appellees.**

**No. 6224.**

United States Court of Appeals
Tenth Circuit.

Sept. 12, 1960.

---

Mart Brown and Rex H. Holden, Oklahoma City, Okl., for appellant.

Luther Bohanon, Oklahoma City, Okl. (Bert Barefoot, Jr., Oklahoma City, Okl., on the brief), for appellees.

Before BRATTON, PICKETT and LEWIS, Circuit Judges.

LEWIS, Circuit Judge.

By complaint filed in the District Court for the Western District of Oklahoma present appellees [1] sought a decree quieting their title to some 74 acres of land located in Oklahoma City as against any claim of the appellant Workman and further seeking to gain authority to reject any contractual relationship found to exist between Workman and Selected upon such conditions as the court determined to be just and reasonable. By his answer and cross-claim Workman expanded the issues to provoke determination of his rights in the stock of Capitol Gate and, in the alternative, to damages against Selected for breach of express or implied contract. The judgment of the trial court resolved each controversy of fact in favor of Selected and denied any relief to Workman upon each of the numerous alternate defenses proposed by Selected. Such a sweeping and adverse judgment has necessitated a wholesale appeal by appellant questioning the sufficiency of the evidence to support most of the trial court's findings and alleging error in the court's conclusions in toto. However, our disposition of the case does

1. Hereinafter referred to as Selected. Selected Investments Corporation and Selected Investments Trust Fund are Oklahoma corporations engaged, originally, in the sale of their own securities and the reinvestment of the monies obtained. In 1958, Selected was in financial trouble and reorganization under Chapter 10 of the Bankruptcy Act was instituted. See

Selected Investments Corp. v. Duncan, 10 Cir., 260 F.2d 918. W. M. Harrison was appointed Trustee by the Bankruptcy Court and the Chapter 10 proceedings are still pending. The appellee Capitol Gate, Inc., is also an Oklahoma corporation. The circumstances of its creation and the ownership of its stock and assets form the background of this controversy.

not require a burdensome consideration of minutia for an examination of the record convinces us that the factual narration to follow is either indisputably true from the record or admitted by the parties.

At a time prior to 1958, Workman conceived the idea that a large shopping center could be profitably developed upon the subject 74-acre tract of land in Oklahoma City. His plan contemplated the acquisition of the acreage; causing the land to be zoned as a commercial business area; constructing buildings thereon; obtaining long-term rental contracts; and using the rental contracts as collateral for obtaining long-term loans from large financial institutions to be applied as reimbursement for the original outlays of money made for the acquisition of the land and the construction of the buildings. Workman approached several persons and companies with his proposal, including Selected. After a period of negotiation with the then officers of Selected and particularly with the president, one Carroll, an oral agreement was reached whereby Selected was to advance the money necessary for the promotion and Workman was to perform the services necessary to make the contemplated shopping center a reality. More specifically, Workman was to negotiate the purchase of the lands, arrange for the rezoning, and then proceed to supervise the construction of the buildings and rent the completed properties. Monies were to be advanced by Selected and repaid, together with ten per cent interest, from the contemplated income or security of the project and, after complete repayment with interest to Selected, Workman and Selected were to share the fruits of the development equally.

Performance began in accord with the terms of the oral agreement. Workman did arrange for the purchase of the tracts of land constituting the 74 acres. The parties organized Capitol Gate, Inc., to receive the land titles as they were acquired and Workman conveyed one or two parcels to Capitol which had been taken in his own name. Capitol was authorized to issue 500,000 shares of $1 par stock but issued only 1,000 shares. Of these 100 shares went to Workman, 100 shares to George H. Shirk, 100 shares to Lucyl H. Shirk, and 700 shares to Selected. Workman and the Shirks promptly assigned their issued shares to Selected. Selected had then made a total outlay of $570,861.65 which reflected in the wholly-held stock of Capitol.

On March 3, 1958, Selected was adjudicated bankrupt and, as we have noted, a plan of reorganization was approved and became operative as contemplated by Chapter 10 of the Bankruptcy Act, as amended, 11 U.S.C.A. § 501 et seq. Investigation indicated that the officers of Selected had caused its financial failure through gross misconduct including the organization of several satellite companies operating for the personal benefit of Carroll and other Selected Officers. See Selected Investments Corp. v. Duncan, supra.

At the time Selected was adjudicated bankrupt Workman had not been successful in having the Capitol Gate property rezoned from residential to commercial and had run into "material obstacles" in his efforts to do so. He continued to attempt to fulfill this obligation after Selected was placed in reorganization and worked closely with the Trustee and his counsel to that end. The rezoning was accomplished, according to the finding of the court, "largely through the work of the Trustee and his attorneys" although Workman was found to have contributed "substantial effort."

On January 12, 1959,[2] Workman wrote the Trustee stating in general terms that he had contacted and interested many desirable tenants for the shopping center and suggested that an architect be employed to prepare drawings of the development so that definite commitments for leased space could be obtained. Two weeks later the Trustee replied thus:

---

2. The rezoning had been accomplished some months earlier.

"Dear Mr. Workman:

"This will acknowledge receipt of your letter of January 12th in regard to your suggestions and ideas for the development of Capitol Gate Regional Shopping Center.

"We always appreciate the interest of others in an effort to solve some of the many problems here at Selected and we, of course, thank you for your ideas in the development of this property. However, due to the many uncertainties involved and the many problems which must be solved, we do not contemplate any type of development at this time for Capitol Gate.

"Again we thank you for your interest and desire to help.

"Very truly yours,
W. M. Harrison
Trustee"

Since the exchange of these letters neither Workman nor Selected has taken any steps to develop the subject property and their opposing claims arising from the course of events stated reflect in the instant action initiated by Selected in April, 1959. And from such course of events the trial court found and concluded that no valid or enforceable contract had ever existed between the parties because, for one of numerous grounds, Workman had "entered into secret and confidential negotiations" with officers of Selected resulting in the misuse of trust funds and that "because of his knowledge of the trust, R. F. Workman, as well as the trustees, was legally prohibited from making an agreement of the nature here involved."

We can find no support in the record justifying the inference that Workman's relationship with the officers of Selected was conspiratorial in nature or that Workman had any knowledge that the officers were being or ever had been derelict in the duties of their trust. The record indicates that the land purchases were made without public disclosure of the interest of Selected in the project. Such procedure is not unusual and indeed is often dictated as good business practice to avoid the hasty raising of prices when the participation of large financial concerns becomes generally known. The procedure will not support an inference of wrongful or fraudulent purpose upon the part of Workman. And, although considerable evidence was offered and received of the misapplication of trust funds by the officers of Selected in many transactions not involving Workman there is no evidence that Workman had knowledge of these transgressions or that the officers contemplated a violation of their trust in regard to Capitol Gate. Workman had no knowledge of the internal affairs of Selected nor information regarding the duties of the trust beyond the general knowledge of the corporate names.[3]

We hold, too, that the court was in error in determining that the agreement of the parties was invalid because of the compulsion of the Oklahoma Statute of Frauds. Here, again, the judgment below was a broadside and without designation as to what provision or provisions of Title 15 Okl.Stat. § 136 [4]

3. Selected Investments Corporation and Selected Investments Trust Fund had been determined to be separate entities by the Supreme Court of Oklahoma in 1957. See Selected Investments Corp. v. Oklahoma State Tax Commission, Okl., 309 P.2d 267. It was only after the Chapter 10 proceedings were instituted that this court determined that the Corporation and Trust Fund should be treated as a single entity in reorganization.

4. 15 O.S.A. § 136: "The following contracts are invalid, unless the same, or some note or memorandum thereof, be in writing and subscribed by the party to be charged, or by his agent:

"1. An agreement that, by its terms, is not to be performed within a year from the making thereof.

"2. A special promise to answer for the debt, default or miscarriage of another, except in the cases provided for in the article on guaranty.

"3. An agreement made upon consideration of marriage, other than a mutual promise to marry.

"4. An agreement for the sale of goods, chattels, or things in action, at a price

were deemed controlling. It is obvious that subsections 2 and 3 are inapplicable. And subsection 5 has been interpreted by the Oklahoma courts as not to constitute a bar to the enforcement of an oral agreement where, as here, the parties join as joint adventurers in a plan to purchase and develop real property, one contributing the use of money, the other performing services. Catlett v. Jordan, 206 Okl. 473, 244 P.2d 564; Florence v. Thompson, 92 Okl. 156, 218 P. 800; Thompson v. McKee, 43 Okl. 243, 142 P. 755, L.R.A.1915A, 521. However, Selected urges the agreement as one for the exchange of personalty, i. e. stock in the corporation of a value in excess of $50, or an agreement that is not to be performed within a year from its making, which contracts must be in writing under subsections 4 and 1 respectively, and then attempts to distinguish the cases cited above as being concerned merely with the transfer of land provision of the statute and not with other portions of the statute which might have voided the contracts. The attempted distinction is tenuous. To explain as oversight the Oklahoma court's broad determinations that an oral agreement to share in profits and losses arising from the purchase and sale of real estate to be not within the statute and that existence of such a partnership or joint venture may be established by parol evidence is not consonant with reason. The Oklahoma court has held that to bring an oral contract within the one-year statute of frauds, there must be a negation of the right to perform the contract within a year, Municipal Gas Co. v. Gilkeson, 160 Okl. 284, 16 P.2d 247, and this is so despite the fact that the parties contemplate that its performance will take more than a year,

Roxana Petroleum Co. of Oklahoma v. Rice, 109 Okl. 161, 235 P. 502. Moreover, the reasoning of the case of Thompson v. McKee, supra, is as applicable to personalty under paragraph 4 as it is to realty under paragraph 5. The court therein adopted the language of Holmes v. McCray, 51 Ind. 358, 19 Am.Rep. 735:

"Suppose two persons, by parol agreement, enter into a partnership to speculate in lands, how do they come in conflict with the statute of frauds? No estate or interest in land has been granted, assigned, or declared. When the agreement is made no lands are owned by the firm, and neither party attempts to convey or assign any to the other. The contract is a valid one, and in pursuance of this agreement they go on and buy, improve and sell lands; it is simply aimed at the creation or conveyance of an estate in lands without a writing.

"As between the partnership and its vendors or vendees in the sale or purchase of lands, the statute in all cases would operate; but as between the partners themselves, when they are neither vendors nor vendees of one another, we cannot see how the statute can affect their agreements."

■ The trial judgment also determined, as an alternate ground for denying recovery, that Workman had materially breached his agreement before Selected refused to go forward with the plans. It is true that at the time Selected became bankrupt Workman had accomplished only one of the four primary services he was obligated to do. He had made the land purchases. But he continued his efforts and the zoning became a

not less than fifty dollars, unless the buyer accept or receive part of such goods and chattels, or the evidences or some of them, of such things in action, or pay at the same time some part of the purchase money; but when a sale is made by auction, an entry by the auctioneer in his sale book, at the time of the sale, of the kind of property sold, the terms of sale, the price and the names of the purchaser and person on whose account the sale was made, is a sufficient memorandum.

"5. An agreement for the leasing for a longer period than one year, or for the sale of real property, or of an interest therein; and such agreement, if made by an agent of the party sought to be charged, is invalid, unless the authority of the agent be in writing, subscribed by the party sought to be charged."

reality through the combined persistence of the parties. It was only after he notified Selected that the next steps could not be taken past the negotiation stage until architectural work was done that Selected indicated that it contemplated no further development for Capitol. And the assigned reason given in the letter to Workman for the decision not to go forward was that the affairs of Selected presented many uncertainties and problems that required solution. The decision was not based upon Workman's performance or lack of it and it was Selected that announced the decision to stop the proposed development and for reasons of its own. So viewed, we find no support in the record for this aspect of the judgment.

■ Finding, as we do, that Workman had a valid agreement with Selected to develop Capitol as a joint adventure it remains to consider what effect in law and fact the bankruptcy of Selected had upon the contract. The contract was then executory in nature, neither party having completely performed and the obligations of each remaining complex. There can be little doubt that the ultimate success of Capitol was highly speculative and that to go forward would require Selected to expend large sums of money. The financial condition of Selected was such as to make the project burdensome and risky and the Trustee was well warranted in rejecting the contract. The trial court properly permitted the rejection pursuant to Sec. 116 of the Bankruptcy Act, 11 U.S.C.A. § 516.[5]

■ The authorized rejection of the executory contract by the Trustee constituted a breach of the contract as a matter of law, 11 U.S.C.A. § 103, sub. c, and Workman was entitled to have the amount of his claim determined by the court. Since the breached agreement was one of joint adventure the damages resulting from the Trustee's rejection do not postulate a quantum meruit determination of Workman's services. Cf. Dugan v. Pettijohn, 134 Cal.App.2d 133, 285 P.2d 339; 30 Am.Jur., Joint Adventures, § 35; Bowling v. Duvall, 270 Ky. 494, 109 S.W.2d 1200; 48 C.J.S. Joint Adventures § 9. And, it being clear from the terms of the agreement that Workman's contemplated benefit from the contract was dependent upon the completed development of the shopping center and only then, he cannot assert a present vested interest in the lands or in the ownership of Capitol Gate, Inc. His claim is limited to the value of his contract at the date the petition in bankruptcy was filed resulting in Selected's adjudication. 11 U.S.C.A. § 103. Upon this aspect of the case the trial court concluded that Workman had suffered no damage[6] because

---

5. Bankruptcy Act, § 116, 11 U.S.C.A. § 516:

"Upon the approval of a petition, the judge may, in addition to the jurisdiction, powers, and duties in this chapter conferred and imposed upon him and the court—

"(1) permit the rejection of executory contracts of the debtor, except contracts in the public authority, upon notice to the parties to such contracts and to such other parties in interest as the judge may designate; * * * *".

6. Finding No. 9 states:

"I find that even though the contract alleged by R. F. Workman should be considered valid, damages arising therefrom, if any, would not be provable as a claim against the debtor estate by reason of the fact that under his own testimony he was to receive no income or profits from such arrangement except out of anticipatory profits realized from the operation of Capitol Gate, Inc., and that such anticipatory profits are too highly speculative, contingent and uncertain to form the basis of any judgment or claim against the debtor estate."

Conclusion No. 5 states:

"Even though it should later be determined by a higher court that a valid contract does exist between the debtor estate and the defendant, I conclude that it should be rejected by the plaintiff and that the defendant, based on the evidence in this case, is entitled to no damages because of such rejection. The amount of damages provable upon the rejection of a contract by a bankruptcy court is governed by state law. In re Mendota Bldg. Co., 7 Cir., 92 F.2d 644. Damages cannot be proved by R. F. Workman with the certainty required by Oklahoma law."

the proof of damage could not rise above speculation and could not reach the area of certainty required by Oklahoma law. 23 O.S.A. § 21; General Finance Corp. v. Dillon, 10 Cir., 172 F.2d 924; Baker & Strawn v. Miller & Jones Bros., 109 Okl. 184, 235 P. 476. No more specific findings were made and their lack frustrates review of the question. Cf. Hatahley v. United States, 351 U.S. 173, 76 S.Ct. 745, 100 L.Ed. 1065. But in any event it is clear that nominal damages should have been awarded and that the question of actual compensatory damages should be explored.

The case is remanded for further proceedings in accord with the views herein expressed and with directions to determine the amount of damages, nominal or actual, that may properly be awarded Workman for the breach of contract occasioned by the rejection of the contract by the Trustee.

PICKETT, Circuit Judge (concurring).

While I am not in disagreement with the conclusions of the majority, I think there is a more satisfactory method of disposing of the case.

From the record it appears that Workman was not at fault when the trust funds of Selected were advanced to finance his project and also that he had a contractual right or claim as a creditor, which he could have presented in bankruptcy. 11 U.S.C.A. § 602. This right or claim comes only from the contract and the parties agree that Workman was to have no interest in the property of Capitol Gate, Inc., until Selected had been repaid all monies which it had advanced, together with 10% interest. To carry out this understanding, all the outstanding common stock of Capitol Gate was held by Selected.

In his answer, Workman pleaded that he stood "ready, willing and able to repay to Selected Investments, with interest, all the money advanced by it to Capitol Gate, Inc., in exchange for full ownership of all of the capital stock of Capitol Gate, Inc." This offer was not withdrawn.

The trustee of Selected has filed an acceptance of this offer, together with a statement of the amount due it under the contract. As indicated in Judge LEWIS' opinion, the trustee in bankruptcy was not required to continue the performance of this executory contract, which would require the investment of additional trust funds therein. It seems to me that a practical and equitable solution would be to allow Workman, within a reasonable time, to acquire the property by payment to Selected of the amount of money advanced by it, together with interest.